# United States Court of Appeals

*for the*

# Fourth Circuit

JAMES BRADY, d/b/a JB & HM Enterprises, Inc.; DANNY GROUP, LLC;
BLAZIAN PROMOTIONS & COMPANY, LLC; HECTOR MELENDEZ,

*Plaintiffs-Appellants,*

– v. –

CITY OF MYRTLE BEACH; JOHN PEDERSON,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA, FLORENCE DIVISION
IN CASE NO 4:19-CV-00107-JD, HONORABLE JOSEPH DAWSON, III

## BRIEF OF APPELLEES

MICHAEL W. BATTLE
BATTLE LAW FIRM, LLC
1200 Main Street
P.O. Box 530
Conway, South Carolina 29526
(843) 248-4321

*Attorneys for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1874    Caption: James Brady v. City of Myrtle Beach

Pursuant to FRAP 26.1 and Local Rule 26.1,

City of Myrtle Beach
(name of party/amicus)

_____

 who is _____an Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                     ☐ YES ☑ NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐ YES ☑ NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Michael W. Battle                          Date:        07/16/2024

Counsel for: City of Myrtle Beach & John Pedersor

- 2 -                    [ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1874          Caption: James Brady v. City of Myrtle Beach

Pursuant to FRAP 26.1 and Local Rule 26.1,

John Pederson
(name of party/amicus)

_____

who is _____ an Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                     ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                  ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐ YES ☑ NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Michael W. Battle                    Date:        07/16/2024

Counsel for: City of Myrtle Beach & John Pedersor

- 2 -

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES .................................................................. 1

STATEMENT OF CASE ...................................................................... 1

STATEMENT OF FACTS ................................................................... 2

    I.    General Background .......................................................... 2

    II.   Specific facts for Blazian Promotions & Company, LLC d/b/a Natalia's Bar and Grill ....................................................... 4

        Factual Findings .............................................................. 5

        a.    Service calls ........................................................ 5

        b.    Nuisance Activity Illegal Drugs ......................... 6

        c.    Nuisance Activities – Violence .......................... 9

        d.    Safety Plan Violations ....................................... 11

    III.  Specific Facts for Hector Melendez d/b/a Pure Ultra Club, LLC ............................................................................ 16

        Nuisance Activity ........................................................... 17

        (1)   Unlawful adult entertainment ............................ 17

        (2)   Continuous breach of the peace ......................... 17

        (3)   Illegal gambling activity .................................... 19

        (4)   Repeated acts of unlawful possession or sale of controlled substances ........................................ 20

    IV.  Specific facts for Danny Group, LLC. d/b/a Ibiza Hookah Lounge ............................................................................. 21

    V.   Specific facts for James Brady, d/b/a JB & HM Enterprises, Inc ................................................................. 22

    VI.  The Trial Court's Directed Verdict Rulings ..................... 23

SUMMARY OF ARGUMENTS ........................................................26

STANDARD OF REVIEW ...........................................................28

DISCUSSION.........................................................................29

    I.      The trial judge did not err in ruling on Appellant's purported motion to amend pursuant to Rule 15(B), FRCP ...............................29

    II.     The trial court properly granted a directed verdict as to JB & HM's claims ........................................................................31

          1.     JB & HM takings claims.........................................31

          2.     JB & HM's equal protection claim...........................33

          3.     JB & HM's due process claims ...............................35

    III.    The trial court properly granted a directed verdict on Danny Group, Blazian, and Melendez's claims............................37

          A.    Police presence claims ..........................................37

          B.    Unlawful discrimination/selective enforcement of nuisance laws......................................................40

          C.    Intra-corporate conspiracy doctrine.........................45

CONCLUSION .....................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A Soc'y Without a Name v. Va.*,
  655 F.3d 342 (4th Cir. 2011) .................................................................47

*Addie v. Kjaer*,
  737 F.3d 854 (3d Cir. 2013) .................................................................30

*Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals*,
  440 S.C. 266, 890 S.E.2d 748 (2023) ...................................................45

*Ashcroft v. al-Kidd*,
  563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) .................53

*Buschi v. Kirven*,
  775 F.2d 1240 (4th Cir. 1985) ......................................................... 46, 47

*Business Development Corp. v. United States*,
  428 F.2d 451 (4th Cir. 1970) .................................................................28

*Cannon v. Vill. of Bald Head Island*,
  891 F.3d 489 (4th Cir. 2018) .................................................................53

*Clubside, Inc. v. Valentin*,
  468 F.3d 144 (2d Cir. 2006) .................................................................34

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999) ...................33

*Crittenden v. Thompson-Walker Co.*,
  288 S.C. 112, 341 S.E.2d 385 (Ct. App. 1986) ....................................48

*Eady v. Koon*,
  No. 3:12-CV-1671-CMC, 2013 WL 652722 (D.S.C. Feb. 21, 2013) .................48

*Edens v. City of Columbia*,
  228 S.C. 563, 91 S.E.2d 280 (1956) .....................................................38

*Elmore v. Corcoran*,
  913 F.2d 170 (4th Cir. 1990) .................................................................30

*ePlus Tech., Inc. v. Aboud*,
  313 F.3d 166 (4th Cir.2002) .................................................................46

iii

*Frampton v. SCDOT*,
406 S.C. 377, 752 S.E.2d 269 (2013) .................................................................37

*Gairola v. Com. of Va. Dep't of Gen. Servs.*,
753 F.2d 1281 (4th Cir. 1985) ...........................................................................28

*Greenville Publ'g Co. v. Daily Reflector, Inc.*,
496 F.2d 391 (4th Cir. 1974) ............................................................................46

*Habash v. City of Salisbury, Md.*,
618 F. Supp. 2d 434 (D. Md. 2009) ...................................................................40

*Hawkins v. Sims*,
137 F.2d 66 (4th Cir. 1943) ..............................................................................28

*Love v. Pepersack*,
47 F.3d 120 (4th Cir. 1995) ..............................................................................36

*McLeod v. Stevens*,
617 F.2d 1038 (4th Cir. 1980) ...........................................................................30

*MLC Automotive, LLC v. Town of S. Pines*,
532 F.3d 269 (4th Cir. 2008) ............................................................................36

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).....................................30

*Nationwide Mutual Insurance Co. v. McLaughlin*,
429 F.2d 1317 (4th Cir. 1970) ..........................................................................28

*Orgain v. City of Salisbury, Md.*,
305 F. App'x 90 (4th Cir. 2008) ........................................................................40

*Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*,
148 F.3d 396 (4th Cir. 1998) ............................................................................31

*Painter's Mill Grille, LLC v. Brown*,
716 F.3d 342 (4th Cir. 2013) ................................................... 46, 47, 51

*Richards v. City of Columbia*,
227 S.C. 538, 88 S.E.2d 683 (S.C. 1955) ..........................................................38

*S.C. State Highway Dep't v. Wilson*,
254 S.C. 360, 175 S.E.2d 391 (1970) ................................................................37

*Scott v. Greenville Cnty.*,
716 F.2d 1409 (4th Cir. 1983) ................................................... 32, 33

*Simmons v. Poe*,
  47 F.3d 1370 (4th Cir. 1995) .................................................................47

*Smith v. Town of S. Hill*,
  611 F. Supp. 3d 148 (E.D. Va. 2020) ...................................................47

*Smith v. United States*,
  568 U.S. 106, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013) ....................53

*Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*,
  420 F.3d 322 (4th Cir. 2005) .................................................................33

*Sylvia Dev. Corp. v. Calvert County*,
  48 F.3d 810 (4th Cir. 1995) ...................................................................36

*Village of Willowbrook v. Olech*,
  528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) ...........33, 34

*Washlefske v. Winston*,
  234 F.3d 179 (4th Cir. 2000) .................................................................31

*Wheatley v. Gladden*,
  660 F.2d 1024 (4th Cir. 1981) ...............................................................28

*Willis v. Marshall*,
  275 F. App'x 227 (4th Cir. 2008) ..........................................................34

*Willis v. Town of Marshall, N.C.*,
  426 F.3d 251 (4th Cir. 2005) .................................................................34

*Younger v. Crowder*,
  79 F.4th 373 (4th Cir. 2023) ..................................................................53

**Statutes & Other Authorities:**

42 U.S.C. § 1983 ........................................................................... *passim*

42 U.S.C. § 1985 ........................................................................... *passim*

42 U.S.C. § 1985(3) ....................................................................... *passim*

S.C. Code 1976, Tit. 5, Ch. 13 .....................................................48

S.C. Code Ann. § 5-7-30 ..............................................................48

S.C. Code Ann. § 5-13-90 ............................................................48

S.C. Code Ann. § 61-6-4190 ..........................................................3

v

Fed. R. Civ. P. 15(B) ........................................................ 26, 29

Fed. R. Civ. P. 16 ............................................................ 26, 29

Fed. R. Civ. P. 59(e) ........................................................... 31

Fed. R. Evid. 201 ............................................................... 35

## JURISDICTIONAL STATEMENT

The underlying case involved claims under 42 USC §1983 and 42 USC §1985, thereby creating a federal question within the jurisdiction of the District Court.

## STATEMENT OF ISSUES

1.  Did the lower court err in granting directed verdicts on the grounds that no fair-minded jury could find that Appellees City of Myrtle Beach and John Pederson violated the Appellants' rights under state law and under 42 U.S.C. §1983 and 42 U.S.C. §1985?

## STATEMENT OF CASE

This appeal arises from a March 20, 2023, jury trial of two consolidated cases against the City of Myrtle Beach and its former City Manager, John Pedersen. At the close of Appellants' case, Appellees made motions for directed verdict. The lower court granted those motions for directed verdict with respect to certain Appellants §1983 claims and state law claims, but reserved judgment on their motion with respect to Appellant James Brady's §1983 claims and the other Appellants'§1985 claims. At the close of the case, Appellees renewed their motion for a directed verdict. The trial court granted that motion, dismissing the remainder of Appellants' claims. This appeal followed.

## STATEMENT OF FACTS

I.      General Background

Around 2013, Appellee Myrtle Beach City Manager John Pedersen began
receiving disturbing reports from the City Police Chief Warren Gall about serious
crimes and public safety incidents occurring in a confined commercial area of the
City known as the Superblock. JA 748. In the Superblock, between 2013 and 2016,
late-night establishments or nightclubs had begun opening on properties encircling
a City owned public parking lot.  Those late-night establishments were known as
Pure Ultra Club, Levelz, Club Global, Farlo's Burrito Bar, Ibiza Club and Hookah
Lounge and Natalia's Bar and Grill.  After those late-night establishments opened
for business, the number of violent crimes and drug related crimes increased in
those clubs and throughout the Superblock including in the City parking lot. JA
473.



**"Superblock" aerial photo**

Police records showed that between February 15, 2015, and November 5, 2016, eleven people were shot in the Superblock area. Numerous other assaults, criminal sexual conduct incidents, and drug and alcohol violations were also reported in the Superblock area during this timeframe. JA 471 & JA 549. The crimes occurred in the public parking area, surrounding streets and inside the above-named clubs. JA 551.

The Myrtle Beach Police Department (MBPD) responded to the problems by increasing its presence throughout the Superblock. Pursuant to S.C. Code Ann. §61-6-4190, City police together with other officers from the South Carolina Law Enforcement Division made regulatory inspections of the night clubs serving alcohol. In addition, MBPD regulatory officers counseled the club owners on best practices to maintain control and order through implementation of a safety plan as required by City Code. JA 478–522.

Some club owners would not or could not control the criminal and/or public nuisance activities of their customers. As a result, MBPD recommended to the City's business license official, Mary McDowell, that those clubs' business licenses be revoked. JA 713 & JA 4404. Upon receiving a recommendation to revoke a business license, Ms. McDowell conducted an independent investigation into that particular club's alleged unlawful activities. If she found the club had in fact engaged in public nuisance activities associated with its business, she issued a

notice of suspension to the club owners stating her reasons for suspending a business license.  JA 4167 & JA 1136.

Upon receipt of the notice, the club owner had 15 days to appeal the suspension to City Council.  JA 4170 & JA 1136.  If the club owner appealed, City Council conducted a formal hearing where the club owner was allowed to be heard and represented by an attorney.  JA 719 & JA 4171.  After the hearing, City Council would issue a written order either dismissing the business license suspension as unfounded or affirming the business license official's decision and converting the temporary suspension into a permanent revocation. JA 4469. If City Council revoked a club's business license, the owner had the right to appeal the revocation to the State Court.  JA 727.

II.    *Specific facts for Blazian Promotions & Company, LLC d/b/a Natalia's Bar and Grill*

On March 25, 2015, Appellant Blazian Promotions & Company, LLC, ("Blazian") obtained a business license in the name of Natalia's Bar and Grille and began operating in the Superblock.  Blazian was owned by Natalie Litsey.

Approximately one and one-half years later, Police Chief Warren Gall wrote the business license official a letter formally requesting the revocation of Blazian's business license because of nuisance activity pursuant to § 11-35 of the City of Myrtle Beach Code of Ordinances. JA 4404. After conducting an independent review, the business license official determined that sufficient reasons existed to

issue a notice of suspension. She sent the notice of suspension to Natalie Litsey, outlining the basis for the suspension. JA 4412.

Blazian appealed the notice of suspension to City Council. City Council held a hearing on the appeal, which Ms. Litsey attended along with her attorney. Ms. Litsey and several other fact witnesses testified during the hearing. Ms. Litsey's attorney was permitted to cross examine the witnesses and to call other witnesses. JA 4471.

After the hearing, City Council issued a written order permanently revoking Blazian's business license. JA 145. City Council made the following findings of fact in its order:[1]

## Factual Findings

*a. Service calls.*

1. From March 25, 2015, to November 10, 2016, Natalia's had a call history of 94 calls for assistance from the police. Natalia's has an occupancy capacity of 133 people. By comparison, for the same period, St. George, a similar business nearby, had a call history of 26 calls for assistance. St. George has

---

[1] City Council's order was introduced as Appellants' Exhibit 2 during the trial. JA 720-721 It was not included in the Joint Appendix through oversight. The text above is an accurate copy and it is included in the appendix to Appellees' brief. See Appellees' Exhibit 2 Table of contents and JA 4155.

an occupancy rating of 229. Natalia's call history indicates problems with unlawful activities and with following its Safety Plan.

2. The calls may be broken down as follows:

- 4 Assaults

- 1 Burglary Auto

- 5 City Code or Business License Violation

- 11 Directed Patrols

- 5 Disturbance/Disorderly

- 1 Found Property

- 3 Larceny

- 4 Loitering

- 5 Narcotics Related

- 32 Public Assistance

- 2 Shooting Incidents

- 4 Suspicious Persons

- 2 Wanted Persons

*b. Nuisance Activity Illegal Drugs*

3. On December 5, 2015, John Reamsnyder, while employed at nearby bar, Farlo's Burrito Bar, was arrested and charged for carrying illegal drugs ranging from cocaine to meth to ecstasy to marijuana. Two scales were

6

found in the car, and the drugs were packaged in multiple zip-lock baggies for distribution. Reamsnyder was carrying a handgun in his waistband and another handgun was found in a book bag in his car.

4. On December 25, 2015, MBPD encountered Reamsnyder in Natalia's reeking of a strong odor of marijuana. He stated he was employed by Natalia's. The officer's report noted that Reamsnyder was a known drug dealer. When contacted about Reamsnyder, Natalia's business owner stated to Officer Robertson that she was aware of Reamsnyder's past but that he had told her he had sworn off drugs and was no longer dealing. Ms. Litsey testified that she watched Reamsnyder closely while he was in her business but did not follow his activities in the parking areas around her business.

5. On January 24, 2016, Reamsnyder was observed by police officers outside the back door of Natalia's selling drugs to Natalia's customers. He was arrested and found to have 25 schedule IV pills and 6 unknown green pills believed to be ecstasy.

6. On January 25, 2016 Ofc. Robertson contacted the business owner again and notified her of the additional drug incidents involving Reamsnyder. The business owner stated Reamsnyder would be fired and not allowed back at Natalia's.

7. On January 28, 2016, Reamsnyder was arrested again in the parking lot directly behind Natalia's for simple possession of marijuana. At the time of his arrest, he stated was employed at Natalia's as a promoter.

8. On March 1, 2016, Reamsnyder was again observed in the parking lot behind Natalia's selling drugs to Natalia's customers.

9. On July 2, 2016, Daniel Whittington, a disc jockey employed by Natalia's, was observed retrieving a mason jar containing marijuana and small baggies and a handgun from his car that was parked at the back door of Natalia's. When MBPD officers approached Mr. Whittington, he ran into Natalia's and attempted to hide the mason jar and handgun behind the D.J. booth inside Natalia's. The police arrested Mr. Whittington. During the arrest, the customers of Natalia's were disorderly, interfering with the police investigation by confronting the officers with questions and refusing to move away from the arrest scene. Security officers did not cooperate with the police at the arrest scene. Two additional arrests of Natalia's customers were made for public intoxication.

10. On August 10, 2016, David Cuccia, a security guard formerly employed by Natalia's, gave a sworn statement that at Natalia's there were many activities that were illegal such as occupancy violations, illegal gambling, drug usage, gang activity, violation of liquor laws (serving after 2:00 am)

sale of closed bottled liquor, weapons (handgun) and illegal sale of alcohol in the bathroom.

11. Unlawful activities and nuisance activities in connection with Natalia's business operations were committed repeatedly by Natalia's employees during 2015 and 2016.

c.   *Nuisance Activities – Violence*

12. On July 21, 2016, a shooting occurred inside Natalia's where the victim was shot three times by a known gang member with a handgun.  After the shooting, security cleared out Natalia's customers. When everyone left the building, the manager locked the doors and left the premises.  The police were never called by Natalia's employees.  MBPD learned of the incident through a report that a gunshot victim had come to Grand Strand General Hospital.

13. Natalia's manager, Donato Eagan, was charged with nuisance activity by failing to report the incident as required by City Ordinances.  *Sec. 10-24 Code of Ordinances.*  Later, she was tried and found guilty of the charge.

14. MBPD did obtain a video recording of the shooting from Natalia's security cameras.  Upon observing the video, MBPD discovered numerous violations of Natalia's Safety Plan which will be discussed below.  The Safety Plan violations included among other things the failure to report the

incident to the police. As a result, Natalia's Safety Plan was temporarily revoked by MBPD.

15. Natalia's employees violated the conditions of its Safety Plan by failing to contact MBPD and reporting the shooting incident of July 21, 2016.

16. On October 22, 2016, officers responded to shots fired behind Natalia's. Sgt. Steven Clothier spoke with Natalia's security guard. The security guard told Sgt. Clothier that prior to the shooting, four black men who appeared to be armed had approached Natalia's to come inside. One of the men told the security guard that they were looking for the person who had just broken into his car. Natalia's security locked their doors and refused to let the men into the club. Security then watched the men leave and cross a nearby parking lot. After hearing the shots, they watched the men leave and watched one of the men return, get into the car of a high-ranking Blood gang member, and then leave the scene.

17. Again, Natalia's licensees violated its Safety Plan by not reporting the incident to MBPD. The security guard told Sgt. Clothier that he called his dispatch but did not call the police. He said that he did not have the opportunity to call police because police responded so quickly. The security guard also told Sgt. Clothier that he had not seen any of the men before and did not know their names. However, the security guard went on to tell Sgt.

Clothier that one of the men frequents Danny's, a club off of Hwy. 501 outside the City, and the bouncer at Danny's, Rico, would know the suspect. He also told Sgt. Clothier that one of the men left in a burgundy Caprice, which is owned by a high-ranking Blood gang member. The security guard's contradictory statements – that he had never seen the men before and then giving information about their habits and associates – led Sgt. Clothier to believe the security guard was not completely forthcoming about the identities of the four black men.

d.  *Safety Plan Violations.*

18. On April 22, 2014, and on September 23, 2014, the City of Myrtle Beach adopted ordinances that required drinking places and nightclubs to create and adopt Safety Plans to foster public safety for our citizens and visitors, to curb underage drinking, to increase awareness of over-service of alcoholic beverages and to meaningfully address and reduce criminal activity on the business premises of drinking places and nightclubs. The plan submitted by the businesses was required to be approved by the MBPD. Once submitted and approved, the Safety Plan became part of the conditions of Natalia's business license.

19. Natalia's is a drinking place that comes under the ordinance. On April 13, 2015, Natalia's Safety Plan was submitted and approved by the MBPD. The Safety Plan contained the following agreements among others:

    a. Natalia's will have a contractual agreement in place with Advanced Protective Services to maintain security inside and outside of the premises. Female security officers will be available to assist with the female patrons. Drugs of any sort will not be permitted or tolerated in or outside of the premises.

    b. Aggressive and/or violent behavior would not be tolerated. Patrons who are disorderly will be detained by the SLED certified guards until the Myrtle Beach Police Department arrives.

    c. No alcohol consumption will be permitted in the parking areas and outside the premises of the building.

    d. Staff will not be allowed to consume alcohol beverages while working.

    e. All staff will monitor patron's alcohol consumption and will set reasonable limits for all patrons to ensure they are safe and as well as, the safety of others.

f.  Incident reports will be completed for any incident that involves a patron/employee that has become uncontrollable.

g.  Natalia's will co-operate with MBPD to delay detain patrons via warrantless arrest.  911 Emergency services will be contacted if incidents become out of order.

h.  Response to Serious Criminal Incidents.  In the event of serious criminal incident, suspects and witnesses will be detained until emergency services and local law enforcement arrives. Surveillance video, witness statements, in-house incident reports and any other necessary documentation will be released to the appropriate parties. Natalia's will package the following for Law Enforcement Agencies:

   a. Financial records of patron(s) purchases

   b. Video images of all involved parties

   c. Images of scanned ID's

   d. Glasses and utensils used by the involved parties, which may yield further evidence.

   e. Observation statements of witness.

20. The video recording of the shooting that occurred on July 21, 2016, revealed that with the exception of making a video recording none of the

above listed conditions in the Safety Plan were followed by Natalia's on the night of the shooting. As a result, Natalia's Safety Plan was revoked on July 29, 2016.

21. On August 1, 2016, Officer Lisa Robertson served Natalia's with notice that the MBPD had revoked Natalia's safety plan, and any further operation of Natalia's would be a public nuisance.

22. On August 5, 2016, Natalia's was open for business, and the manager misrepresented to police officers that Natalia's had an approved safety plan. On August 6, 2016, Natalia's was again open without an approved safety plan. When officers approached the club, there was no security working the front door. The business owner was not at the club. MBPD officers wrote the bartender a citation for operating without a safety plan. The bartender asked if Natalia's had to close, and the officers told the bartender they could not force the club to close, but remaining open would reflect poorly on the club. The club chose to stay open for the rest of the night.

23. After considerable discussions with Natalia's about its violations, Natalia's received permission to submit a revised security plan. On August 22, 2016, Natalia's revised security plan was approved by MBPD.

24. On October 22, 2016, the second known shooting incident occurred behind Natalia's. As stated above, prior to the shooting, four men who appeared to

be armed had approached Natalia's to come inside. One of the men told the security guard that they were looking for the person who had just broken into his car. Natalia's security locked their doors and refused to let the men into the club.

25. Natalia's security felt so certain that the four men intended to commit violence that they locked the doors to the club and would not let them inside. Security then watched the men walk across the nearby parking lot, heard gunshots in the rear alley, then security watched the men run from the scene and watched one come back into the parking lot and get in the car of a high-ranking Blood gang member. While the security had time to call their own dispatch, no one ever called the police. Failing to call police in the face of such criminal activity is the same issue MBPD had with Natalia's violation of its Safety Plan after the July 21st shooting.

26. Natalia's did not have a video recording of the October 22nd incident to provide to the investigating officers. Natalia's failed to replace the video recorder taken into evidence by MBPD. The failure to have an operational video recorder violated Natalia's Safety Plan.

27. By violating its Safety Plan, Natalia's violated the conditions which governed its right to do business under its business license in the City of Myrtle Beach. JA 145

Blazian appealed City Council's order to state court. However, Blazian later abandoned the state court appeal, and it was dismissed. JA 335.

III.    *Specific Facts for Hector Melendez d/b/a Pure Ultra Club, LLC*

Around the end of 2014 or the beginning of 2015, Hector Melendez opened Pure Ultra Club in the Superblock. JA 252. In August 2015, the City enacted a moratorium on new drinking establishments in the Superblock. JA 792. Thereafter, an entity known as Faith and Family expressed interest in acquiring Pure Ultra. Faith and Family began negotiating with Melendez and sent a letter of intent offering to purchase the business with the contingency that it be allowed operate the same business at the same location. JA 1128. Melendez made a counteroffer to the letter of intent. Faith and Family never responded.

Approximately two years after Pure Ultra Club opened, Police Chief Warren Gall wrote to the business license official requesting the revocation of the business licenses for Pure Ultra Club, LLC ("Pure Ultra") for nuisance activity pursuant to Section 11-35 of the City of Myrtle Beach Code of Ordinances. JA 4404. After conducting an independent review, the business license official determined that sufficient reasons existed to issue a notice of suspension. The business license administrator sent the notice of suspension to Hector Melendez outlining the reasons for the suspension.

The business license official's determination was based upon the following findings:

*Nuisance Activity*

*(1)  Unlawful adult entertainment.*

There are online videos posted by Exotic Entertainment which show parties at Pure Ultra in which the DJ appears to be smoking marijuana, a patron is drinking liquor straight from a liquor bottle, and women are performing lap dances on men while other men throw money at the women. The online videos at Pure Ultra depict sexual activity defined as "erotic touching or fondling of human genitals, pubic region, buttocks or female breasts." See Sec. 14-1. Pure Ultra is licensed as a night club with food sales, and it was not licensed as an adult entertainment business. Therefore, the depicted sexual activity at Pure Ultra is unlawful activity related to the business that violated the zoning and adult entertainment ordinances of the City of Myrtle Beach.

*(2) Continuous breach of the peace.*

On November 5, 2016, at 2:30 am, a shooting occurred inside Pure Ultra in which five people were shot. Security footage shows the suspect opened fire in the club without warning or provocation. Four of the five victims went to

the hospital, and one was listed as critical due to a bullet through his femoral artery.

Almost all of the people involved in the shooting on November 5th are affiliated with a violent gang. The suspect shooter was Cleavon Dantzler aka Ghetto. According to Officer Christine Snyder, the Gang Investigator for the Horry County Sheriff's Department, Dantzler is a Blood gang member. Ventrell Dukes aka Trap, who was with Dantzler during the shooting, is a Folk Nation gang member. Dukes was also involved in a shooting at Farlo's on October 8, 2015. Dale Turner aka Little Daddy, the most seriously injured victim from the shooting, is a Blood gang member, and Jermaine Gattison aka Big Ghat and Shawn Tisdale, both victims, are Gangster Disciples. The woman who Turner used as a human shield during the shooting is not affiliated with a gang.

November 5th was not the first gang related shooting at Pure Ultra. On July 3, 2016, at 1:30 am, Elijah Shaheed Spivey aka Jay Fivee shot two bullets through the front window of Pure Ultra while passing in a red pickup truck. The two bullets bracketed the security guard standing outside. Spivey is a Blood gang member.

On November 1, 2015 at 3:10 am, MBPD officers conducted a walk-through of Pure Ultra and saw patrons being served alcohol after 2:00 am on a

Sunday. As officers began speaking to the bartender about the drinks she had just been serving, a fight broke out in the club. Other officers attempted to respond to the fight but could not due to the club's doors being locked. After the officers disbursed the fight, they again talked to the bartender, and she denied serving any alcohol. Officers wrote the business owner a citation. In addition to the alcohol violation, officers could not find any uniformed security inside the club or anyone counting the number of patrons coming into the club.

Under §15-43-10(a), a business where continuous breach of the peace occurs in this State is guilty of a public nuisance.

*(3)  Illegal gambling activity.*

On January 4, 2016, SLED Agents found illegal gambling machines in Pure Ultra in a storage closet in the back. After SLED Agents saw the machines through the upper portion of the exterior door, they saw an individual in the office unplug the machines. When SLED Agents advised the club's owner, Hector Melendez, that refusing access to the closet would be an additional violation, Melendez opened the closet. The SLED Agents found two individuals inside playing the gambling machines. The Agents issued Melendez a ticket for gambling. Although Melendez requested a jury

trial and his ticket is still pending, a Magistrate Judge found the machines to be gambling machines and ordered them destroyed.

Illegal gambling is an unlawful business activity related to the operation of a business under §11-35(5), Code of Ordinances for the City of Myrtle Beach.

*(4) Repeated acts of unlawful possession or sale of controlled substances,*

In the security footage of the November 5, 2016, Pure Ultra was crowded with people drinking alcohol well after 2:00 am. This is a violation of City Code of Ordinances, Section 14-2(j), which requires clubs and host promoters that serve alcohol close by 2:00 am.

On September 18, 2016 at 4:33 am, MBPD officers did a walk-through of Pure Ultra and found the club serving alcohol after 2:00 am on a Sunday. One of the managers told the officers that they were having a private party but could not provide a guest list. A second manager told the officers that it was not a private party, and the club was open to the public. The officers issued the club a ticket for a liquor law violation.

On November 1, 2015 at 3:10 am, MBPD officers conducted a walk-through of Pure Ultra and cited Pure Ultra employees for serving alcohol after 2:00 am on a Sunday.

On November 14, 2015, at 2:07 am, MBPD officers conducted a walk-through of Pure Ultra and cited Pure Ultra employees for serving alcohol after 2:00 am on a Sunday. Officers also smelled the odor of marijuana and found marijuana on a table in the back of the club.

Under §15-43-10(a), a business where Repeated acts of unlawful possession or sale of controlled substances occurs in this State is guilty of a public nuisance. JA 1136

Melendez duly appealed the notice of suspension to City Council and City Council scheduled a hearing to be held on January 10, 2017. Melendez did not attend the hearing. Melendez, however, was represented by attorney Paul Young, who advised the City's attorney that Melendez was withdrawing his appeal. The reason given for that decision was that Hector Melendez did not wish to engage in further business in the City of Myrtle Beach due to his health condition. City Council accepted the withdrawal. Pure Ultra's suspension was converted to a revocation. City Council's order of revocation adopted the above-stated findings reflected in the business license official's notice of suspension. Melendez did not appeal City Councl's revocation to state court. JA 4469.

IV.  *Specific facts for Danny Group, LLC. d/b/a Ibiza Hookah Lounge*

On September 18, 2015, Danny Group, LLC obtained a business license to operate Ibiza Hookah Lounge in the Superblock. Danny Group, LLC was owned

by Mo and Danny Karam. Ibiza Hookah Lounge rented space in the Superblock to operate its business. Ibiza Hookah Lounge's alcohol beverage license was limited to selling only beer and wine. Ibiza Hookah Lounge was not successful in attracting customers. Sometime later it was evicted by its landlord for failure to pay rent. Ibiza Hookah Lounge's business license expired on its own terms. JA 274-302.

### V. *Specific facts for James Brady, d/b/a JB & HM Enterprises, Inc.*

In 2010, James Brady purchased two buildings located in the Superblock. Mr. Brady and his friend Hector Melendez remodeled the buildings and, in 2011, Mr. Brady received a certificate of occupancy. In 2012, the property was leased to Club Pulse which operated as a night club without extraordinary incidents from 2012 to 2014. JA 212. When Club Pulse's lease ended, Melendez's Pure Ultra Club, LLC, entered into a lease with JB & HM Enterprises, Inc ("JB & HM").

For the reasons stated above, Pure Ultra Club's business license was revoked by City Council in 2017. On October 15, 2018, Sawn Lowe and Joseph Lowe entered a lease agreement with JB & HM Enterprises, Inc, with a special stipulation that the lease was subject to the City's approval for the Lowes' intended use of the property, which included operation as a video gaming arcade. After the City's denial of the Lowes' application, the Lowes did not reapply or appeal.

Instead, the Lowes' withdrew their business license application, and the lease was canceled by both parties. JA 184-251.

VI.    *The Trial Court's Directed Verdict Rulings*

The various Appellants brought two (2) suits against Appellees, which were consolidated for trial.  JB & HM alleged causes of action for: 1) "Tortious Interference of Contract and Action under United states Code, Section 1983", 2) "Violation of Section 1983 United States Code of Law", 3) Breach of Contract, and 4) Civil Conspiracy.[2]  (JA 36-39). The remaining Appellants alleged claims for: 1) "Tortious Interference of Contract", 2) "Unconstitutional Taking under the South Carolina Constitution", 3) "Violation of 42 U.S.C. §1983 – Unconstitutional Taking", 4) "Violation of 42 U.S.C. §1983 – Lack of Due Process", and 5) "Violation of 42 U.S.C. §1985(3) – Civil Conspiracy to Hinder Constitutional Rights." (JA 63-72).

At the conclusion of Appellants' case, Appellees moved for a directed verdict on Appellants Danny Group, Blazian, and Melendez's claims for Tortious Interference of Contract, Unconstitutional Taking, Violation of their Due Process, and Civil Conspiracy under § 1985.  (JA 372).  Blazian and Danny Group ultimately withdrew their tortious interference claims during oral argument.  The

_____

[2] JB&HM's conspiracy claim was waived by its attorney. (JA 378).

trial judge then granted a directed verdict on all Danny Group, Blazian, and Melendez's remaining claims except the 1985 civil conspiracy claim.  (JA 456).

With regard to Melendez's tortious interference with contract claim, the court held there was no evidence of a contract between Melendez and JB & HM that could have been breached; therefore, Melendez could not establish an essential element of this cause of action.  As it relates to the Danny Group, Blazian, and Melendez's takings claims, the trial court found that these Appellants did not have a vested property interest in the right to conduct their business.  Because the activity of making a profit is not property, the trial court granted Appellee's directed verdict motion on these Appellant's takings claims.

As to these Appellants' due process claims, the court reiterated that there is no property interest in operating a business thus they could not establish an essential element of a procedural due process claim.  The trial court further held that there was sufficient due process between the time of suspension and revocation of the business licenses because an appeal process existed.  Concerning these Appellants' substantive due process claims, the trial court held the suspension and revocation of a business license was not a legally sufficient basis to find for these Appellants because the City's actions in suspending and revoking the licenses did not fall so far beyond the outer limits of legitimate governmental action that no process could cure considering such action are constitutionally recognized police

powers of the government. Thus, the trial court granted Appellees' directed verdict motion on Danny Group, Blazian, and Melendez's due process claims.

Appellee City of Myrtle Beach also moved for a directed verdict on JB & HM's tortious interference with contract and 1983 claims. The trial court granted the motion as to the tortious interference claim on the grounds that JB & HM had not offered any evidence to support the fact that Appellee City's conduct procured the breach of either the contract with the Lowes or with Pure Ultra. Rather, the evidence showed Pure Ultra terminated its lease because its business license was revoked and the Lowes' terminated their agreement because they did not obtain approvals for the intended use of the property. The trial judge took the directed verdict motion as to JB & HM's 1983 claim under advisement. (JA 463).

After Appellees presented their case, they renewed the directed verdict motion as to Danny Group, Blazian, and Melendez's §1985 civil conspiracy claim and JB & HM's §1983 claims. The trial court granted the directed verdict motion on the civil conspiracy claim under 42 U.S.C. §1985 pursuant to the intra-corporate conspiracy doctrine. The court held that, even when viewed in a light most favorable to Appellants, the evidence did not tend to establish a conspiracy between the City and another person/entity because all the individuals alleged to be involved in the conspiracy were employees or agents of the City and the acts alleged to give rise to the conspiracy were all authorized by the City. JA 927

With regard to JB & HM's 1983 claims, the trial court found that to the extent it was grounded upon a procedural due process violation, there was not sufficient evidence upon which the jury could find such a violation. In granting a directed verdict motion on JB & HM's takings claim, the trial court held JB & HM had no vested property right to conduct business and therefore could not show a taking of its property. As to JB & HM's substantive due process claim, the court held there was no legally sufficient basis for a reasonable jury to find for JB & HM because the denial of permits or business licenses to JB & HM's potential tenants did not fall so far beyond the outer limits of legitimate governmental interests that no process could cure considering denial of permits is a recognized police power and there was nothing in the record indicating the denial of a right to appeal the permit decision. Accordingly, the trial court granted a directed verdict in Appellees favor as to all remaining claims. JA 927.

## SUMMARY OF ARGUMENTS

I.      The trial judge did not err in ruling on Appellant's purported motion to amend pursuant to Rule 15(B), FRCP.

Appellants' motion was not made as stated in brief. The motion was denied pursuant to Rule 16 FRCP. The argument that the issues were tried by consent is without merit. All of Appellants' evidence was relevant to other causes of action in

their pleadings.  Their evidence did not relate solely to the new claims Appellants sought to add.

II.    The trial court properly granted a directed verdict as to JB & HM's claims.

JB &HM never had a constitutionally protected property interest that could be taken.  JB & HM did not introduce evidence from which a reasonable jury could infer Appellees treated it differently from others similarly situated. In connection with Appellants' substantive due process claims, the trial court properly held that Appellants' actions did not fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency.

III.    The trial court properly granted a directed verdict on Danny Group, Blazian, and Melendez's claims.

Those Appellants did not have a constitutionally protected interest in the operation of a business in a leasehold space under South Carolina law.  Appellees' expert opined that Appellees exercise of police power was reasonable and appropriate in response to the activity they were facing.  Appellants did not offer evidence to refute those opinions.  Appellants' evidence does not show that the City or its police were solely motivated by racial animus.

IV.    Appellants Danny Group, Blazian, and Melendez's claims §1985 conspiracy claims were barred by the intra-corporate conspiracy doctrine.

There was no evidence that the alleged co-conspirators were not employees of the City of Myrtle Beach acting in the scope of their employment or that their acts were not authorized. An employee/agent 's act must be solely motivated by racial animus to be unauthorized. The Appellees were performing the duties assigned to them.

## STANDARD OF REVIEW

In ruling on a directed verdict motion, the court, without weighing the evidence or considering the credibility of the witnesses, must determine whether "there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Wheatley v. Gladden*, 660 F.2d 1024, 1027 (4th Cir.1981); *see also Nationwide Mutual Insurance Co. v. McLaughlin*, 429 F.2d 1317 (4th Cir.1970). Unless there is " 'substantial evidence to support' the verdict asked of the jury," the reviewing court must direct the verdict upon request. *Business Development Corp. v. United States*, 428 F.2d 451, 453 (4th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 266 (1970) (quoting *Hawkins v. Sims*, 137 F.2d 66, 67 (4th Cir.1943)). *See also Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985)

# ARGUMENT

## DISCUSSION

I. *The trial judge did not err in ruling on Appellant's purported motion to amend pursuant to Rule 15(B), FRCP*

Appellants claim they made a motion to amend their pleadings to conform to the evidence admitted during trial at the end of their case. However, it appears based on a review of the transcript that Appellants' moved to amend their complaint to add Pure Ultra Club, LLC as a party because Pure Ultra Club, LLC was a contracting party with JB & HM in connection with Appellants' claim for tortious interference with a contract. JA 426. That motion was properly denied by the trial judge pursuant to Rule 16, FRCP. JA 77. As reasoned by Judge Dawson, the fact there was some evidence in the record to support a contract between JB & HM and Pure Ultra rather than JB & HM and Melendez does not warrant amending the pleadings to add a new party to survive a directed verdict motion. The deadline to add parties had long expired and Appellants provided no explanation as to why they waited to the close of their case to seek the amendment. Accordingly, the trial court properly denied the motion to amend.

In their Motion to Reconsider and in the Opening Brief, Appellants claim their pleadings should have been amended to allege an unauthorized activity exception to the intra-corporate conspiracy doctrine in their civil conspiracy cause of action under 42 USC §1985(3). Appellants also claim an equal protection cause

of action should have been added to the lawsuit alleging the City was liable to the

Appellants under 42 USC §1983 for an unconstitutional custom or policy. See

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56

L. Ed. 2d 611 (1978).  JA 77 & ECF 20.

Appellants argue that their motion to amend should have been granted

because the amendments they sought to add to the complaint were tried by the

consent of the parties is without merit.  Evidence used to amend the pleadings

pursuant to the doctrine of trial by implied consent cannot be relevant to any other

issue before the trial court and must bear solely on the new issue. *See Addie v.*

*Kjaer*, 737 F.3d 854, 867 (3d Cir. 2013).  Nor can the Appellees' consent be

implied solely from the introduction at trial of evidence relevant to Appellants'

conspiracy claims. A court will not imply consent to try a claim merely because

evidence relevant to a properly pleaded issue incidentally tends to establish an

unpleaded claim. *Elmore v. Corcoran*, 913 F.2d 170, 173 (4th Cir. 1990); *McLeod*

*v. Stevens*, 617 F.2d 1038, 1040–41 (4th Cir. 1980)

Appellants did not allege or offer evidence the City's employees acted

outside the scope of their authority.  Appellants did not allege or offer evidence of a

violation of a §1983 *Monell* custom or policy. *Monell v. Dep't of Soc. Servs. of City*

*of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  To the

contrary, certain Appellants pled and offered evidence that "all defendants" were

engaged in a racially discriminatory conspiracy to remove Appellants' businesses from the Superblock in violation of 42 USC §1985(3). JA 54.

Appellants' motion to amend was properly denied because the amendment at such a late stage of trial was found to be prejudicial to Appellees and a motion to amend, to alter or amend judgment may not be used to raise new arguments or present novel legal theories that could have been raised prior to judgment. FRCP 59(e), 28 U.S.C.A. *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396 (4th Cir. 1998). (JA 77)

II.     *The trial court properly granted a directed verdict as to JB & HM's claims.*

Appellant JB & HM presents three arguments for reversing the trial court's grant of directed verdict against it. First, JB & HM claims Appellees took its constitutionally recognized property rights without just compensation. Second, JB & HM claims its equal protection rights were denied by Appellees. Third, JB & HM claims its substantive due process rights were violated under §1983.

1.     *JB & HM takings claims.*

The Takings Clause of the Fifth Amendment provides that no "private property be taken for public use, without just compensation," and this limitation on governmental power has been imposed on the States through the Fourteenth Amendment. *Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000). "The Takings Clause protects private property; it does not create it." *Id.,* at 183. A

necessary prerequisite of a takings claim is the existence of a constitutionally protected property interest.

Appellant JB & HM argues it had a protected property interest in its tenant's dealings with Faith and Family. It claims Appellees took its property interests by enforcing a non-liquor, non-nightclub moratorium on property throughout the Superblock which effectively prevented its tenant, Pure Ultra Club, from selling its business and rights to sell alcohol to Faith and Family. (JA 40) However, JB &HM never had a constitutionally protected property interest that could be taken. The evidence shows that the relationship between JB & HM's tenant and Faith and Family never passed beyond unsuccessful negotiations over the terms of a letter of intent. (JA 1128)

JB & HM argues it had a protected property interest in a lease with the Lowes which was taken when the City denied the Lowes application for a business license. The lease between JB & HM and Lowes was contingent upon the Lowes' business use being approved within the zoning district in which it was located. Their business license application was not approved. The denial of a prospective tenant's business license does not give rise to a takings claim. *Scott v. Greenville Cnty.*, 716 F.2d 1409, 1421-22 (4th Cir. 1983). While the right to a permit prior to issuance is protected by the due process clause, non-issuance of the permit does

not effectively destroy the value of the property. JB & HM has no takings claim for the denial of a prospective tenant's business license. *Id.*

JB & HM's takings claim was premised on the theory that Appellees made it difficult for JB & HM to lease its property. As stated by the trial court, JB & HM does not hold a vested property interest in "the right to conduct business." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 667, 119 S. Ct. 2219, 2222, 144 L. Ed. 2d 605 (1999)(business in the sense of the activity of doing business or of making a profit is not property at all). Accordingly, the trial court did not err in granting a directed verdict in Appellee's favor on JB & HM's takings claim.

### 2. JB & HM's equal protection claim.

To establish an Equal Protection claim, JB & HM must show: 1) the classification to which it belongs; 2) that the classification was the basis of the City's decision; and 3) that the classification prompted the government to engage in intentional, purposeful discrimination. *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 329 (4th Cir. 2005). In the instant case, JB & HM does not claim membership in a class or group but argues it is a "class of one." An Equal Protection claim can be brought by a "class of one," "where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village*

*of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000); *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 263 (4th Cir. 2005). For a plaintiff to demonstrate that it is similarly situated, the evidence "must show an extremely high degree of similarity between [itself] and the persons to whom [it] compare[s]." *Willis*, 275 Fed. Appx. at 233 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).

JB & HM did not introduce evidence from which a reasonable jury could infer Appellees treated it differently from others similarly situated to a high degree. JB & HM's claim is that Appellees had enacted a general moratorium which applied to its potential tenant, Faith and Family, who desired to purchase Pure Ultra Club. Even if Faith and Family actually attempted to purchase and run a business such as Pure Ultra Club in the Superblock, the unchallenged general moratorium would have prevented any a new bar licensee from opening in the Superblock. §11-25(a) Code of Ordinances City of Myrtle Beach.

JB & HM argues that Grand Strand Brewing was a similarly situated business that was treated differently from its businesses. However, JB & HM has presented no evidence from which a jury could reasonably conclude that JB&HM's potential tenants intended uses of the property were similar to Grand Strand Brewing. JB & HM's potential tenants' first proposed use of its property was a new late-night club that served alcohol. The second was a virtual video arcade,

which was not a permitted use in the Superblock. Grand Strand Brewing is a micro-brewery/restaurant.

Lowes' business license application was not denied because of an expired moratorium. Without offering any evidence at trial, JB & HM argues the Lowes' arcade use was permitted in the Superblock. However, neither JB & HM nor the Lowes contested or appealed the denial of the business license application. JB & HM falsely claims that at the time of the Lowes' denial, Grand Strand Brewing was making beer and selling liquor in the Superblock. The City denied the Lowes' business license application in October of 2018. Grand Strand Brewing, LLC did not exist and was not incorporated until 2019. [3]

3.     *JB & HM's due process claims.*

JB & HM does not argue that its procedural due process rights were violated. Rather, JB & HM argues that the City violated its substantive due process rights by revoking Pure Ultra Club's business license, enacting a general moratorium in the Superblock, and not approving the business license application of a potential tenant.

To establish a violation of substantive due process, a plaintiff "must demonstrate (1) that they had property or a property interest; (2) that the

---

[3] Appellees request that this Court take judicial notice of the S.C. Secretary of States' corporate filing for Grand Strand Brewing, LLC.  Rule 201 FRE

government deprived them of this property or property interest; and (3) that the government's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *MLC Automotive, LLC v. Town of S. Pines*, 532 F.3d 269, 281 (4th Cir. 2008) (quoting *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir.1995)). "Substantive due process is a far narrower concept than procedural." *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995). The protection of substantive due process covers only state action which is "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Sylvia Dev. Corp.*, 48 F.3d at 827.

In the present case, the trial court properly held that the City's actions did not fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency. The City's actions at issue were to deny the Lowes' business license application and to not allow Faith and Family to be exempted from a moratorium on business licenses for new night clubs selling alcohol. The City's actions were not arbitrary or irrational. Even if the City erred in denying the business license applications, the City's appeals process was available to correct any alleged errors. §11-34 Code of Ordinances of the City of

Myrtle Beach. Appellants did not attack the City's codes or appeal the City's actions.

III.   *The trial court properly granted a directed verdict on Danny Group, Blazian, and Melendez's claims..*

   A.   *Police presence claims.*

Appellants claim that the City's police presence in the Superblock constituted a taking of a constitutionally protected interest in the operation of a business in a leasehold space under South Carolina law.  Appellants appear to argue that the City's exercise of its police power in the Superblock constituted a taking by inverse condemnation.  Appellants cite the case of *Frampton v SCDOT*, 406 S.C. 377, 752 S.E.2d 269 (2013) to support their claim.  To the contrary, *Frampton* does not support Appellants' claim because it reaffirms South Carolina law that inverse condemnation and/or eminent domain does not apply to the exercise of police power.  In *Frampton*, the appellate court found that SCDOT's actions did not constitute the exercise of police power.  The Frampton court further noted that South Carolina courts recognize that there is a distinction between the exercise of the police power and the exercise of the power of eminent domain; that just compensation is required in the case of the exercise of eminent domain but not for the loss by the property owner which results from the constitutional exercise of the police power. *See also S.C. State Highway Dep't v. Wilson*, 254 S.C. 360, 365,

175 S.E.2d 391, 394 (1970); *Richards v. City of Columbia*, 227 S.C. 538, 88 S.E.2d 683; *Edens v. City of Columbia*, 228 S.C. 563, 91 S.E.2d 280.

To show Appellees exercised reasonable police power, Appellees introduced evidence from their police expert John Alan Cocklin. Mr. Cocklin has been involved with 17,000 investigations into alcohol businesses that serve alcohol and responses. He's been qualified as an expert witness on police practices and standards in New Jersey together with several states throughout the East. He investigated the City's police practices in the Superblock to determine if actions of the Myrtle Beach Police Department in addressing violations of South Carolina law, Myrtle Beach ordinances, and ensuring health and safety of the city's residents and visitors were arbitrarily applied or violated the standard of care imposed on a law enforcement officer. JA 664. Mr. Cocklin opined the actions taken by the Myrtle Beach Police Department to bring Appellants' businesses into compliance with the laws of South Carolina and insure public safety were reasonable, measured, and an appropriate response given the severity of the conduct that Appellants Blazian and Melendez allowed to occur on their leased premises. (JA 682)

In connection Ibiza Hookah Club, Mr. Cocklin opined the Myrtle Beach Police Department took no action to seek the suspension or revocation of Ibiza's business license, and so the Myrtle Beach Police Department's actions or inactions

were not the cause of that Appellant's loss of business. JA 682. Appellants did not offer an expert on the reasonableness on the presence of the Myrtle Beach Police to contradict Mr. Cocklin's opinions. Appellants only offered the speculation of the business owners on the affect of the City's police presence on the operation of their businesses. Appellees contend that the City's police presence made their businesses safer and caused the business owners to comply with the law.

Appellees police expert testified that public policing of businesses that sell alcohol is extraordinarily complex. Cocklin stressed that alcohol is a unique product and in fact it is the only product which has two U.S. constitutional amendments. Cocklin explained alcohol is highly regulated because of the hazards associated with intoxication, which can cause individuals to be a danger to themselves and others. JA 668-669. Mr. Cocklin testified that the amount of police presence in the Superblock was reasonable and necessary to obtain compliance with City ordinances and state laws and to promote public safety. JA 682.

None of Appellants' evidence, whether considered singly or collectively, could persuade a fair-minded jury that the City or its police were solely motivated by racial animus. Appellants' argument is based on the false syllogism that the City's actions hampered clubs whose clientele was mixed but predominately black, ergo the City's actions must have been motivated by race. This syllogism cannot

substitute for the type of solid proof required to withstand a motion for directed verdict. *Habash v. City of Salisbury, Md.*, 618 F. Supp. 2d 434, 443 (D. Md. 2009). The City's regulatory officer, Stephanie Parran, gave unrefuted testimony that the City closed numerous nuisance businesses owned by non-minority business owners for similar nuisance activities throughout the City. (JA 585)

Other evidence in the record underscores the flimsiness of Appellants' arguments. For example, City Councilman Mike Chestnut is black. He testified that public safety was his central concern about the Superblock. (JA 352) As the Fourth Circuit observed in another case "[b]y noting this fact, the district court was apparently relying upon the commonsense notion that, as a member of the same race as the predominant number of Appellants' customers, the City likely did not take the race of such customers into account...." *Orgain v. City of Salisbury, Md.*, 305 F. App'x 90, 103 (4th Cir. 2008).

The object of police presence was not to drive Appellants' patrons away. Appellees' police expert opined that based on his investigations, he found the object of the City police was to obtain compliance with the existing laws of South Carolina. There is no evidence of claims of excessive use of force or false arrests.

B.  *Unlawful discrimination/selective enforcement of nuisance laws.*

Appellants Blazian, Melendez and Danny Group did not allege causes of action for unlawful discrimination/selective enforcement of nuisance laws in their

amended complaint. Judge Dawson noted in footnote 7 to his order on Appellants' motion to reconsider that Danny Group, Blazian, and Melendez argue that they suffered disparate treatment from the selective enforcement of the City's nuisance laws or by revoking Blazian and Melendez's business licenses. Although Blazian and Melendez did not appeal their license revocations and Danny Group allowed its license to expire, these plaintiffs did not raise a Selective Enforcement claim or equal protection claim in their complaint. In fact, Plaintiffs conceded that the Danny Group Case and JB&HM Case lawsuits did not include a Fourteenth Amendment cause of action. Plaintiffs' new legal cause of action, which was available before trial, is not an appropriate basis for reconsideration.

Even if the Appellants' claims were properly raised, Appellants' arguments on selective enforcement of the nuisance law involves only Melendez and Blazian. The City did not enforce nuisance laws against Danny Group, LLC. In connection with Hector Melendez and Blazian, the City enforced the nuisance law through business license revocation proceedings. Melendez and Blazian were given due process during the business license revocation proceedings and hearings provided to each entity. As shown in the above statement of facts, Melendez and Blazian were given adequate notice of the numerous reasons why their business licenses were being revoked and were provided with a chance to refute those reasons

through hearing processes that complied with the due process requirements of the U.S. Constitution. (JA 1136 & JA 4167)

Appellees dispute Appellants' claim that the cause of the initiation of the Melendez and Blazian nuisance actions was the total number of times that the police responded to a location or a "totality of circumstances." In the present cases, the reasons for initiation of Blazian and Melendez's business license revocation proceedings started with enforcement of the City's ordinance for revocation of a business license. (JA 612) §11-35(5) *Myrtle Beach Code of Ordinances* (including a licensee's engaging in unlawful activity related to the business as grounds for suspension of revocation of a business license). Nuisance activity related to the operation of the business exists when the responsible party generates, enables, or contributes to the occurrence of the unlawful behavior by an absence or failure of property management policy or practice, absence or failure of control over the property, absence or failure of supervision of guests or invitees, absence or failure of security measures or where required safety plans are not in place, or where persistent violations of law occur under a failed or ineffective safety plan, as required by the City. See §10-22(b) & §14-4 Myrtle Beach Code of Ordinances. In addition, public nuisances exist in structures where gambling devices, slot machines, punch boards and other such contrivances of similar

character are used in violation of South Carolina law. *See* §10-22(b)(1) *Myrtle Beach Code of Ordinances.*

MBPD investigated the incidents that occurred in Blazian and Melendez's businesses and determined that the matters should be referred to the business license official to evaluate if grounds existed for suspension or revocation. After public hearings in which Blazian and Melendez had the opportunity to participate, City Council affirmed the business license official's suspensions and permanently revoked Blazian's and Melendez's business licenses. Melendez abandoned his appeal to City Council and Blazian abandoned its appeal in state court. (JA 335 & JA 398)

Melendez's Pure Ultra Club was a public nuisance. In addition to other unlawful acts in Pure Ultra Club, South Carolina Law Enforcement Division officers seized gambling machines in Melendez's business. (JA 4425) The presence of gambling machines in a business is defined as a nuisance by City code. §10-22(b)(1) *Code of Ordinances of the City of Myrtle Beach.* Also, there were two shootings Pure Ultra Club, one of which involved an incident where five patrons were shot. (JA 4167)

Blazian's club, Natalia's Bar and Grille, likewise was a public nuisance. Blazian's club had two shootings and drug activity which it failed to report as required by its safety plan. Blazian's night manager pled guilty to operating the

club without a proper safety plan.  In addition, there were numerous incidents documented where Blazian violated its safety plan. (JA 4412)

MBPD officers were not motivated by improper purposes.  Appellants' claims appear to stem from a fundamental misunderstanding of police operations in connection with night clubs that sell alcohol and the significant, negative ramifications of nuisance activities on public safety.  Appellants did not provide any testimony from an expert witness experienced in police operations in connection with night clubs or the impacts of nuisance activities on public safety. Instead, Appellants relied on their own speculations.

For example, Appellants speculate that a building inspector's alleged comment referring to Melendez as a "stupid Mexican" made several years before Pure Ultra Club was opened showed the police acted with improper motives. Building inspectors are not the police and they have no authority over the City police. Appellants speculate David Sebok's e-mails which Appellees contend were made in connection with his duty to purchase property showed the police acted with improper motives.  David Sebok is not a police officer, and he had no authority over the police.  Appellants speculate that John Pederson's attempt to explain why club owners were responsible under nuisance laws for the acts of the clientele they attracted to their businesses during cross examination, showed the

police acted with improper motives. John Pederson was not a police officer, and he did not give the police any instructions on how to police. (JA 554)

Appellants did not offer evidence to refute the testimony of John Pederson and Assistant Police Chief Marty Brown together with Appellants Natalie Litsey and James Brady that crime and public safety problems existed in the Superblock long before the Blazian's and Melendez's clubs lost their business licenses. Appellants do not argue and there is no evidence that the City's actions failed to make the Superblock a safer place.

Appellants argue that the mere decision to eliminate all bars in the Superblock is an improper purpose. Appellants' argument is not supported by the law. For example, zoning laws can be enacted to eliminate all new uses within a zoning district. *See Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals,* 440 S.C. 266, 890 S.E.2d 748 (2023), cert. denied sub nom. *Ani Creation, Inc. v. Myrtle Beach,* 144 S. Ct. 556, 217 L. Ed. 2d 296 (2024).

*C.     Intra-corporate conspiracy doctrine.*

The trial judge found that Appellants Blazian, Melendez, and Danny Group who pled claims through 42 USC §1985(3) for civil conspiracy were barred by the intra-corporate conspiracy doctrine. Specifically, the trial court ruled that there was no evidence from which a reasonable jury could that the alleged co-conspirators were not employees of the City of Myrtle Beach acting in the

scope of their employment and that their acts were not motivated in part to further the City's business.

The intra-corporate conspiracy doctrine first arose in the antitrust context but has also "been applied in the civil rights area." *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) (collecting cases). Under the intra-corporate conspiracy doctrine, a corporation cannot conspire with its employees because the employees' acts are the corporation's own. *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013) (citing *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir.2002)). There are, however, two important exceptions to the doctrine. First, the doctrine is generally inapplicable "where a co-conspirator possesses a personal stake independent of his relationship to the corporation." *ePlus Tech.*, 313 F.3d at 179; *see also Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). Second, a plaintiff may state a conspiracy claim where the agent's acts were not authorized by the corporation. *Buschi*, 775 F.2d at 1252–53. *Painter's Mill Grille*, 716 F.3d at 353.

Appellants argue Appellees' acts were not authorized and fall within the second exception to the intra-corporate conspiracy doctrine. Appellants argue Appellees alleged motives for committing acts on behalf of the City are the only test for whether the acts were authorized. Appellants' argument is wrong because it is based on a false premise. Motives and acts are different legal concepts.

Motives might determine whether a person is a good or bad person, but motives alone do not determine whether the *act* violates 42 USC §1985.  To state a claim for a § 1985 conspiracy, a plaintiff must show five elements: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class[ ]based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *A Soc'y Without a Name v. Va.*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995)); *Smith v. Town of S. Hill*, 611 F. Supp. 3d 148, 187 (E.D. Va. 2020)

An employee/agent 's act must be ***solely*** motivated by racial animus to be unauthorized. *See Painters Mill Grille*, 716 F.3d at 352.  Courts recognize that employees can commit one act with more than one motive. If employees' motives, at least in part, are to further the business of their employer, then they are considered the acts of the employer under the intra-corporate conspiracy doctrine. *Id.*  If the employee's acts are the acts of the employer, there is no conspiracy, and the intra-corporate conspiracy doctrine bars a conspiracy claim under 42 USC §1985(3). *Buschi*, 775 F.2d at 1251.

In the present case, determining whether Appellees' employees acts furthered the business of the City involves examining the duties assigned to them.

*Crittenden v. Thompson-Walker Co.*, 288 S.C. 112, 116, 341 S.E.2d 385, 387–88 (Ct. App. 1986); *Eady v. Koon*, No. 3:12-CV-1671-CMC, 2013 WL 652722, at *5 (D.S.C. Feb. 21, 2013).  Appellee John Pederson was employed as the City Manager during all the events alleged in the complaints.  His duties are set forth in the City's ordinances and in state law.  Specifically, the city manager shall perform and exercise the duties and responsibilities specifically prescribed in S.C. Code 1976, Tit. 5, Ch. 13, and as may otherwise be prescribed by federal or state law or the city council.  The manager has the duties of the chief executive officer and head of the administrative branch of the municipal government. He shall be responsible to the municipal council for the proper administration of all affairs of the municipality. S.C. Code Ann. § 5-13-90; §2-105, *Code of Ordinances of the City of Myrtle Beach*.  The City's affairs include any subject which appears to it to be necessary and proper for the security, general welfare, and convenience of the municipality or for preserving health, peace, order, and good government in it. S.C. Code Ann. § 5-7-30.

Beginning around September 2015, the City began enacting ordinances designed to redevelop target areas with incentives. *Ord. No. 2015-70, adopted Sept. 22, 2015.*  The target areas included the Superblock. The purpose of the ordinances was to provide the means by which Council may employ temporary extraordinary measures to restore a given area's ability to attract normal

development and redevelopment activity consistent with the public health and safety. In its pursuit of the public good, Council determined it was appropriate to take extraordinary measures to encourage investment for purposes of redevelopment in designated areas of special interest. Such measures may be warranted in order to alleviate conditions of blight or other impediments to the public health and safety. In such instances, Council may deem it appropriate to enter into development agreements that grant specific rights or incentives in order to spur redevelopment in those areas temporarily so as to restore the attractiveness of the areas and to enable them to develop and redevelop in ways that are consistent with the public health and safety under normal market conditions thereafter. *See* §15-50 *Code of Ordinances City of Myrtle Beach.*

The Superblock was one of the areas targeted. §15-51 *Code of Ordinances City of Myrtle Beach.* The evidence is undisputed that public health and safety problems existed in the Superblock as early as 2013. JA 748. Each one of the City's employees accused of engaging in a civil conspiracy acted within the scope of his employment to further the City's interest in redeveloping the Superblock. Those interests involved public health and safety together with the revitalization of the Superblock.

As City Manager, John Pederson was charged with preserving the public health, peace, and welfare in the Superblock. He reported regularly to City

Council on his acts to further the City's goals in that area. His testimony shows that his efforts focused on improving public health and safety problems that existed in the Superblock. His efforts included assisting the City through using the Downtown Redevelopment Corporation (DRC) to acquire property in the Superblock that could be used for redevelopment. JA 554.

Warren Gall was the Police Chief for the City during the events described in the complaint. His duties are set forth in the City's ordinances. Specifically, the City Code provides that the chief of police shall be the chief executive of the police force; he shall be chargeable with and responsible for the execution of the various rules and regulations of the council and the provisions of this Code and other city ordinances governing the police department, and all the provisions of this Code and other ordinances and rules and laws of the city together with state laws within the city. §16-2 *Code of Ordinances of the City of Myrtle Beach.*

Chief Gall was responsible for enforcing the City ordinances. His acts of requesting the business license official to suspend or revoke some of the Appellants' business licenses were done as part of his duties in connection with the enforcement of §11-35 of the City Code prohibiting operating a business where the business has engaged in an unlawful activity or nuisance related to the business. The police were also responsible for enforcing the City ordinances requiring night clubs to have and enforce approved safety plans. §14-4 *Code of*

*Ordinances of the City of Myrtle Beach*.  The unappealed findings of City Council

and the business license official in suspending and/or revoking Blazian and

Melendez's  business licenses show that the police chief's acts were done in

furtherance of obtaining compliance with the City's ordinances.  Further, the City's

police expert, John Cocklin, opined that the police activities in the Superblock

were reasonable and necessary to obtain compliance with City ordinances and state

laws and to promote public safety.  JA 682.

David Sebok was the Director of the DRC during the events alleged in the

complaint.  The DRC was an arm of the City. Its mission was to revitalize and

improve the downtown area. The DRC made recommendations to the City and some

of those actions required city council action, not DRC action.  JA 990. Mr. Sebok

appeared before city council to report the status of the DRC's activities. JA 994.

Sebok participated in the redeveloping and revitalizing the Superblock

businesses together with other areas in the City.  All of his acts were related to

furthering the City's goals and purposes when it enacted ordinances designed to

redevelop targeted areas in the City. *Ord. No. 2015-70.*

Accordingly, the trial judge properly found that the evidence in the record

did not support a basis to find that Appellees' motivations behind the City acquiring

property in the Superblock were based solely on racial animus. *See Painters Mill*

*Grille*, 716 F.3d at 352 (The intra-corporate conspiracy doctrine "is not avoided

simply by showing that corporate employees were motivated in part by personal bias;" rather, the doctrine "probably would not apply where corporate employees are shown to have been motivated solely by personal bias…because the interests of the corporation would have played no part in the employees' collective action, so the action could not have been taken within the scope of employment.")" Therefore, the grant of directed verdict on the civil conspiracy claim should be affirmed.

Appellants argue that Appellees 'public safety justification is a false pretext. Appellees disagree. Obtaining compliance with City ordinances is a primary responsibility of City police and its other employees. In addition, public safety is a legitimate City goal that was sought by police actions in the revitalization and redevelopment efforts and goals of the City for the Superblock. (JA 682) Those goals are shown in the City's ordinances and the testimony of the witnesses. *Ord. No. 2015-70; §§15-50; 15-53 Code of Ordinances of the City of Myrtle Beach.* The evidence in the record showed that the City of Myrtle Beach provided funding to acquire the property occupied by Appellants' businesses together with other businesses in the City. The City Manager and as a member of the DRC, was motivated at least in part by the goal of increasing public safety in the Superblock and implementing the City's property acquisition plan.

Appellants conflate the concept of qualified good faith immunity with the exception to the intra-corporate conspiracy doctrine. The essence of a conspiracy

is the combination of two or more minds for an unlawful purpose. *Smith v. United States*, 568 U.S. 106, 110, 133 S. Ct. 714, 719, 184 L. Ed. 2d 570 (2013). To overcome qualified immunity, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)) *Younger v. Crowder*, 79 F.4th 373, 385 (4th Cir. 2023). The elements required to establish each legal concept are different. Qualified immunity and the intra-corporate conspiracy doctrine are different tools used by the courts to achieve justice in different scenarios.

## CONCLUSION

For the reasons set forth above, Appellees City of Myrtle Beach and John Pederson respectfully request that this Court affirm the decision of the trial judge directing a verdict in favor of the Appellees and that the Court dismiss the appeal.

July 16, 2024

*S/Michael W. Battle*
Michael W. Battle Fed ID #1243
Battle Law Firm, LLC
PO Box 530
1121 3rd Ave.
Conway, SC 29528
(843-248-4321)
mbattle@battlelawsc.com

Attorneys for Appellees

## Certificate of Service

On July 16, 2024, I electronically submitted the foregoing document with the clerk of court for the United States Court of Appeals for the Fourth Circuit, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

*s/Michael W. Battle*
Michael W. Battle Fed ID #1243
Battle Law Firm, LLC
PO Box 530
1121 3rd Ave.
Conway, SC 29528
(843-248-4321)
mbattle@battlelawsc.com

Attorneys for Appellees

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __23-1874__     **Caption:** James Brady v. City of Myrtle Beach

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [✓] this brief or other document contains ___11755___ [*state number of*] words

    [ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

    [✓] this brief or other document has been prepared in a proportionally spaced typeface using
    Microsoft Word _____ [*identify word processing program*] in
    Times New Roman 14 _____ [*identify font size and type style*]; **or**

    [ ] this brief or other document has been prepared in a monospaced typeface using
    _____ [*identify word processing program*] in
    _____ [*identify font size and type style*].

(s) _Michael  W.  Battle_____

Party Name _City of Myrtle Beach; Pederson_____

Dated: _07/16/204_____

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

Ordinances of the City of Myrtle Beach.................................................................. Add.1

Order, dated July 21, 2023..................................................................................... Add.14

Order of City Council of Myrtle Beach, dated January 17, 2017............................ Add.28

- Sec. 11-34. - Denial of license.

- SHARE LINK TO SECTION PRINT SECTIONDOWNLOAD (DOCX) OF SECTIONSEMAIL SECTIONCOMPARE VERSIONS

- The license official may deny a license to an applicant when the license official determines:

- (1)

- The application is incomplete or contains a misrepresentation, false or misleading statement, or evasion or suppression of a material fact;

- (2)

- The activity for which a license is sought is unlawful or constitutes a public nuisance per se or per accidens;

- (3)

- The applicant, licensee, prior licensee, or the person in control of the business has been convicted within the previous ten years of an offense under a law or ordinance regulating business, a crime involving dishonest conduct or moral turpitude related to a business or a subject of a business, or an unlawful sale of merchandise or prohibited goods;

- (4)

- The applicant, licensee, prior licensee, or the person in control of the business has engaged in an unlawful activity or nuisance related to the business or to a similar business in the municipality or in another jurisdiction;

- (5)

- The applicant, licensee, prior licensee, or the person in control of the business is delinquent in the payment to the municipality of any tax or fee;

- (6)

- A licensee has actual knowledge or notice, or based on the circumstances reasonably should have knowledge or notice, that any person or employee of the licensee has committed a

crime of moral turpitude on the business premises, or has permitted any person or employee of the licensee to engage in the unlawful sale of merchandise or prohibited goods on the business premises and has not taken remedial measures necessary to correct such activity;

- (7)

- The license for the business or for a similar business of the licensee in the municipality or another jurisdiction has been denied, suspended, or revoked in the previous license year; or

- (8)

- The license is sought on behalf of another person who has previously been denied or had a business license revoked because of unlawful activity or nuisance related to the business.

- A decision of the license official shall be subject to appeal as herein provided. Denial shall be written with reasons stated.

- ( Ord. No. 2021-44 , 12-14-21)

- Editor's note— Ord. No. 2021-44 , adopted Dec. 14, 2021, repealed § 11-34 in its entirety and enacted new provisions to read as herein set out. Former § 11-34 pertained to similar subject matter and derived from Ord. No. 2014-18, adopted June 10, 2014; Ord. No. 2014-49, adopted Aug. 12, 2014; Ord. No. 2016-63, adopted Aug. 9, 2016; and Ord. No. 2020-34 , adopted July 28, 2020.

- Sec. 11-35. – Suspension or revocation of license.

- When the license official determines:

- (1)

- A license has been mistakenly or improperly issued or issued contrary to law;

- (2)

- A licensee has breached any condition upon which the license was issued or has failed to comply with the provisions of this ordinance;

- (3)

- A licensee has obtained a license through a fraud, misrepresentation, a false or misleading statement, or evasion or suppression of a material fact in the license application;

- (4)

- A licensee has been convicted within the previous ten years of an offense under a law or ordinance regulating business, a crime involving dishonest conduct or moral turpitude related to a business or a subject of a business, or an unlawful sale of merchandise or prohibited goods;

- (5)

- A licensee has engaged in an unlawful activity or nuisance related to the business; or

- (6)

- A licensee is delinquent in the payment to the municipality of any tax or fee, the license official may give written notice to the licensee or to the person in control of the business within the municipality by personal service or certified mail that the license is suspended as of an effective date pending a single hearing before city council, or its designee, for the purpose of determining whether the suspension should be upheld and the license revoked.

- The written notice of suspension and proposed revocation shall state the time and place at which the hearing is to be held, and shall contain a brief statement of the reasons for the suspension and proposed revocation and a copy of the applicable provisions of this ordinance. The written notice is to be directed to the licensee at the address provided in the licensee's application. The failure of the licensee to sign for certified mail at the address provided does not constitute a bar to administrative action, as the applicant is deemed to have provided accurate information for contact having certified that information under oath, and having expressed consent to administrative oversight by submitting a sworn application for approval.

- ( Ord. No. 2021-44 , 12-14-21)

- Editor's note— Ord. No. 2021-44 , adopted Dec. 14, 2021, repealed § 11-35 in its entirety and enacted new provisions

to read as herein set out. Former § 11-35 pertained to
similar subject matter and derived from Ord. No. 2014-18,
adopted June 10, 2014; Ord. No. 2014-49, adopted Aug. 12,
2014; Ord. No. 2016-63, adopted Aug. 9, 2016; and Ord. No.
2020-34 , adopted July 28, 2020.

- **Sec. 14-4. – Approved safety plan required.**

- **SHARE LINK TO SECTIONPRINT SECTIONDOWNLOAD (DOCX) OF
  SECTIONSEMAIL SECTIONCOMPARE VERSIONS**

- **(a)**

- **Within 45 days of the passage of this ordinance, the police
  department shall develop safe drinking places guidelines to
  be approved by the manager, and cause them to be
  distributed to drinking places and nightclubs. In the
  review of a submitted plan, the police shall be influenced
  by the safe drinking places guidelines, and shall also
  review any incidents occurring at the drinking place,
  nightclub, nightclub district or at events held by the
  nightclub or a promoter at that location, or under that
  management within the preceding 12 months on the issue of
  past compliance with the requirements of this chapter. This
  review shall include past regulatory revocations and
  suspensions, the location's violations of alcoholic liquors
  laws, prior permitees that have been affiliated or
  associated with the applicant, evidence of illegal drug use
  or activity on or about the permitted premises, and
  evidence of noise violations, litter and debris, vandalism,
  thefts, robberies, fighting, disorderly conduct, breaches
  of the peace, service of alcohol to underage persons,
  loitering for the purposes of drug trafficking,
  prostitution or with harmful intent, and other state and
  federal felony criminal activities on or about the
  permitted premises that raises a public safety concern.**

- **(b)**

- **Every drinking place, nightclub operator, nightclub
  entertainment promoter and nightclub district common
  security is required to have a business license and an**

approved safety plan in order to operate and provide entertainment activities.

- another

- An operator or promoter shall have an approved safety plan as a condition of obtaining a new business license or renewing an existing license.

- (d)

- For existing regulated businesses, safety plans shall be filed with the police department within 90 days of the date of the provision of the safe drinking places guidelines by the police department.

- another

- The police shall complete their review and render their decision or recommendations within 30 days of receipt of the application for approval of a safety plan. Incomplete or illegible applications shall be denied, without prejudice to resubmit.

- (f)

- If the police find that the applicant has submitted a safety plan which is incomplete or fails to address required issues or past deficiencies, the police shall not approve the plan. The rejected safety plan shall be returned to the applicant along with a letter stating the specific reason(s) for the denial. The applicant may either resubmit a corrected and completed plan for approval or appeal the denial as provided herein.

- (g)

- The safety plan shall be valid on an annual basis, on the same schedule as the renewal of business licenses. Any fee for police review of the safety plan shall be established by city council.

- (h)

- After initial approval, and if there have been no material changes to a specified drinking place or nightclub's programming, operation, ownership, or size, the updated safety plan may take the form of a letter under affirmation from the operator, nightclub operator, nightclub district

common security or promoter to the police certifying that there have been no material changes to the safety plan which has already been approved and is on file.

- (Ord. No. 2014-26, 4-22-14; Ord. No. 2014-70, 9-23-14)

- **ARTICLE IV. – REDEVELOPMENT TARGET AREAS AND INCENTIVES[3]**

SHARE LINK TO SECTIONPRINT SECTIONDOWNLOAD (DOCX) OF SECTIONSEMAIL SECTIONCOMPARE VERSIONS

*Footnotes:*

*--- (3) ---*

*Editor's note— Ord. No. 2020-4 , § 1, adopted Feb. 11, 2020, amended art. IV in its entirety to read as herein set out. Former art. IV, §§ 15-50—15-54, pertained to similar subject matter and derived from Ord. No. 2015-70, adopted Sept. 22, 2015; and Ord. No. 2017-02, adopted Jan. 24, 2017.*

- **Sec. 15-50. – Purpose; definitions of specific terms.**

SHARE LINK TO SECTIONPRINT SECTIONDOWNLOAD (DOCX) OF SECTIONSEMAIL SECTIONCOMPARE VERSIONS

**(a)**

*Purpose.* **The purpose of this article is to provide the means by which council may employ temporary extraordinary measures to restore a given area's ability to attract normal development and redevelopment activity consistent with the public health and safety.**

In its pursuit of the public good, council may, from time to time, determine that it is appropriate to take extraordinary measures to encourage investment for purposes of redevelopment in designated areas of special interest. Such measures may be warranted in order to alleviate conditions of blight or other impediments to the public health and safety. In such instances, council may deem it appropriate to enter into development agreements that grant specific rights or incentives in order to spur redevelopment in those areas temporarily so as to restore

the attractiveness of the areas and to enable them to develop and redevelop in ways that are consistent with the public health and safety under normal market conditions thereafter.

(b)

*Definitions.* The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Corporate headquarters* means the facility or portion of a facility where corporate staff employees are physically employed, and where the majority of the company's financial, personnel, legal, planning, information technology, or other headquarters related functions are handled either on a regional or national basis.

*Fees, assessments and taxes collected by the city* means payments actually paid to the city directly as impact fees, construction permit fees and charges for services, fire and inspection fees, business license fees, hospitality fees, accommodations taxes and hospitality taxes, and water and sewer charges. Taxes collected on behalf of the City of Myrtle Beach and remitted to it by anotherr government agency may not be paid or redeemed by voucher.

*Incentive* is a measure designed to improve the likelihood of attracting investment in a redevelopment project or projects to be undertaken inside a legislatively designated redevelopment target area.

*Public improvements* include, but are not limited to, streets, streetscapes, sidewalks, utilities, parks, parking facilities, open and green spaces and public art, and facilities or structures designed for the public presentation of performing arts events.

*Redevelopment agreement* is a written agreement between the city and a developer defining the redevelopment project(s) establishing the specific eligibility of the project under this section and setting out the terms of project implementation, including the rights and responsibilities of each party with respect to the redevelopment project(s)

*Redevelopment plan* is a plan, duly adopted by city council, setting out the boundaries of a redevelopment target area, the

basis of the need for redevelopment of the area, the objectives of redevelopment in the area, various means by which the redevelopment may be accomplished, and agreement as to the employment of incentives enabled by this section. Where a master plan for an area has been adopted by previous council action, that area master plan may serve as the redevelopment plan for purposes of this section.

*Redevelopment project or projects* means any approved and permitted work or undertaking by any individual or legal entity under the auspices of a redevelopment plan:

(1)

To clear any lots within a redevelopment target area by demolition or removal of existing buildings or structures and conversion of property to a temporary open or green space or an approved parking area until such time as redevelopment can occur;

(2)

To prepare and execute to finality a redevelopment plan, including the planning, survey and other preparatory work incident to a redevelopment project, as well as the presentment and production costs of all plans to appropriate reviewing bodies, and the subsequent construction of new mixed use developments or construction of new commercial buildings or structures, and the concurrent enhancement of public improvements complementary or essential to the commercial redevelopment, in accordance with a redevelopment plan;

(3)

To perform substantial repair, rehabilitation, or reconditioning of residential structures in such area, as shown completed by the issuance of a certificate of occupancy.

*Redevelopment target area* means a distinct contiguous area in which any combination of four or more of redevelopment factors act, in the judgment of city council, to suppress or stagnate economic and social development of commercial, residential or mixed uses, and which area has been designated a redevelopment target area by legislative action, including the adoption of an area master plan with redevelopment components or the adoption of a redevelopment plan specifically covering the redevelopment

project or projects subject to a proposed redevelopment agreement.

*Redevelopment factors* include:

(1)

Aging of accommodations, but without historical designation;

(2)

Structure dilapidation;

(3)

Structure or land use obsolescence;

(4)

Structure deterioration;

(5)

Land uses incompatible with existing redevelopment or comprehensive plan;

(6)

Structure that have been declared a public nuisance, or have been subject to review as an unfit dwelling;

(7)

Concentrated density without adequate parking, or public transportation;

(8)

Illegal use of individual structures;

(9)

Derelict, vacant or boarded up structures;

(10)

Foreclosures;

(11)

Structures and land uses below minimum code standards;

(12)

Concentration of short- or long-term rental residential property in single-family residential neighborhoods;

(13)

Overcrowding of structures and community facilities;

(14)

Excessive land coverage incompatible with open space needs;

(15)

Deleterious land use or layout in light of the city's comprehensive plan;

(16)

Depreciation of physical maintenance;

(17)

Assessment and tax delinquencies.

*Research and development* means the process of inquiry or experimentation aimed at the discovery of facts, devices, technologies, or applications and the process of preparing those devices, technologies, or applications for marketing.

*Workforce housing* means housing for sale or rent with combined rental costs or combined mortgage loan debt service, property taxes, and required insurance that do not exceed 30 percent of the gross annual income of a household earning between 80 percent and 140 percent of Horry County median income, as defined annually by the United States Department of Housing and Urban Development.

( Ord. No. 2020-4 , § 1, 2-11-20)

- Sec. 15-51. – Programs to attract investment to redevelopment target areas.

(a)

*Council to act by ordinance to declare redevelopment target areas; redevelopment agreements.* City council shall act by ordinance to declare specific areas to be redevelopment target areas, to adopt redevelopment plans, and to authorize redevelopment agreements between the city and a developer. Any ordinance approving a redevelopment agreement hereunder must include the following:

(1)

Set forth the boundaries of the redevelopment area by means of a description of metes and bounds and exhibits including maps and drawings of the proposed project(s).

(2)

Set forth findings as follows with respect to the four or more redevelopment factors necessary to qualify the redevelopment project(s) for the redevelopment incentive program, including:

a.

Based upon evidence presented to it and identified in the proposed ordinance, no fewer than four redevelopment factors persist and exist within an area that may be sufficiently delineated within a boundary, the city council finds that the redevelopment target area would benefit from redevelopment activities based on redevelopment plans and projects, and that the redevelopment incentives are an appropriate tool to stimulate economic growth.

b.

The redevelopment of an identified area is necessary, and in the interest of the public health, safety, morals, or welfare of the residents of such municipality.

c.

A temporary system of redevelopment incentives is appropriate to spur redevelopment in the redevelopment target area, and that qualifying redevelopment activities shall be subject to the redevelopment incentive as provided herein, and subject to council's legislative discretion.

(3)

Set forth other evidence as to the project's or projects' eligibility under the guidelines established in section 15-52 hereof.

(4)

Adopt the redevelopment plan or include a finding that a previously approved redevelopment plan exists and will serve as the redevelopment plan in the current instance.

(5)

Address all rights and responsibilities of the parties with respect to the redevelopment plan and the specific redevelopment projects and incentives to be employed.

(6)

Provide for the appropriation of "fees, assessments and taxes paid to the city," as that term is defined in section 15-52(b)(4) hereof, as and when paid to the city, for the redemption of any incentive voucher in cumulative amounts up to its limit and until its expiration date.

(7)

Address such other matters as may be deemed pertinent and prudent to address in the context of a particular redevelopment project.

(8)

Authorize the execution of the redevelopment agreement between the city and the developer.

(b)

*Certain areas designated as redevelopment target areas.* City council has declared as a redevelopment target area the area bounded by Kings Highway seaward to the Atlantic Ocean, bounded on the Layman's North by 29th Avenue North, and on the Layman's South by the southernmost intersection of Ocean Boulevard and Kings Highway, and on the Layman's west by Kings Highway, including the intersection of King's Highway and including Main Street to the intersection of Broadway and then to 29th Avenue North; and the contiguous parcels of Broadway Street from its northern terminus at Mr. Joe White to the New Town Park on Withers Swash.

Other areas are hereby designated as redevelopment target areas and the duly adopted master plans shall serve as redevelopment plans for those areas:

(1)

The downtown master plan area, including the arts and innovation district and formerly known, in part, as the superblock.

(2)

**The market common master plan area, including specifically the XYZ parcel and adjacent parcels that remain undeveloped or underdeveloped.**

**(** [Ord. No. 2020-4](#) **, § 1, 2-11-20)**

-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JB & HM Enterprises, Inc. | ) | Case No.: 4:19-CV-00107-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Myrtle Beach, South Carolina, | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| | ) | |
| Danny Group, LLC, Blazian Promotions & | ) | Case No.: 4:19-CV-02087-JD |
| Company, LLC, and Hector Melendez, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Myrtle Beach, South Carolina and | ) | |
| John Pederson, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

In this consolidated case[1] after a jury trial that concluded in defense-directed verdicts,

Plaintiffs JB&HM Enterprises, Inc. ("JB&HM") (DE 142) and Danny Group, LLC ("Danny

Group"), Blazian Promotions & Company, LLC ("Blazian"), and Hector Melendez's

("Melendez") (DE 134) (collectively "Plaintiffs") filed Motions to Reconsider the Court's grant

of directed verdicts.  Plaintiffs ask this Court to reconsider its orders granting Defendant City of

Myrtle Beach, South Carolina (JB&HM Case), and City of Myrtle Beach, South Carolina, and

---

[1]      This matter was consolidated by consent motion of the parties with Case No. 4:19-cv-00107-JD ("JB&HM Case") being designated as the lead case in this matter.  (DE 113.)  These cases were originally filed in state court and thereafter removed to federal court.  (DE 1.)  Plaintiffs filed a Motion to Reconsider at DE 142 in Case No.: 4:19-CV-00107-JD and at DE 134 in Case No.: 4:19-CV-02087-JD ("Danny Group Case"); however, the motions track each other in form and substance, and therefore, the Court issues this Order to be filed in both cases.

John Pederson's (Danny Group Case) (collectively "Defendants") directed verdicts. For the reasons set forth below, the motions are denied.

## BACKGROUND

These consolidated cases arise out of disputes between minority business and property owners in the City of Myrtle Beach, South Carolina, with the City of Myrtle Beach and John Pederson ("Pederson"), the City Manager. Plaintiffs owned and operated businesses in the area known as the "Superblock" in the City of Myrtle Beach. The Superblock is bound by Broadway Street to the North, Highway 501 to the South, North Oak Street and 8th Avenue to the West, and 9th Avenue and North Kings Highway to the East. Plaintiff Danny Group, whose members are of middle eastern descent, operated the Ibiza Club and Hooka Lounge located at 810 North Oak Street, Myrtle Beach, South Carolina. Plaintiff Blazian, whose sole member is African American and Filipino, operated Natalia's Bar & Grill. Plaintiff JB&HM, whose principal James Brady is gay, owns buildings 803 and 805 Main Street, where Plaintiff Hector Melendez, who is Latino, was the sole member of Pure Ultra Club, LLC ("Pure Ultra"), which was a bar and lounge that leased property from JB&HM.[2] Danny Group, Blazian, and Pure Ultra originally applied for and obtained business licenses from Defendant City of Myrtle Beach with full disclosure that the businesses would be selling alcohol. Thereafter, Plaintiffs allege among other things that Defendants City of Myrtle Beach and John Pederson harassed the businesses because they were minority-owned businesses to eliminate them so that the City of Myrtle Beach could acquire the properties.

In the JB&HM Case, JB&HM's suit alleges the following causes action: 1) "Tortious Interference of Contract and Action under United States Code, Section 1983", 2) "Violation of

---

[2]    Although Melendez was a party to this suit, Pure Ultra Club, LLC, is not a plaintiff.

Add.15

Section 1983 United States Code of Law", 3) Breach of Contract, and 4) Civil Conspiracy.[3]  (DE 1-1.)  Likewise, in the Danny Group Case they allege 1) Tortious Interference of Contract, 2) Unconstitutional Taking under the South Carolina Constitution, 3) Violation of 42 U.S.C. §1983 – Unconstitutional Taking, 4) Violation of 42 U.S.C. §1983 – Lack of Due Process, and 5) Violation of 42 U.S.C. §1985(3) – Civil Conspiracy to Hinder Constitutional Rights.  (DE 1-1.)

After the Plaintiffs concluded their case, Defendants City of Myrtle Beach and John Pederson moved for a directed verdict on Plaintiffs Danny Group, Blazian, and Melendez's claims for Tortious Interference of Contract, Unconstitutional Taking, Violation of their Due Process, and Civil Conspiracy under § 1985.  During oral arguments on the motion, the Danny Group Case Plaintiffs withdrew their tortious interference claims for Blazian and Danny Group.  The Court found, after reviewing the evidence in the record and drawing all reasonable inferences in favor of the Danny Group Case Plaintiffs, that Defendants' motion should be granted except for civil conspiracy under § 1985.  First, as to Melendez's tortious interference with a contract claim, the Court held that the elements for this claim are: 1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach; 4) the absence of justification; and 5) resulting damages.  See Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322 (4th Cir. 2005).

> An essential element to the cause of action for tortious interference with contractual relations requires the intentional procurement of the contract's breach.  Where there is no breach of the contract, there can be no recovery.

---

[3]     JB&HM's Breach of Contract claim was dismissed at summary judgment (DE 81).  In addition, according to JB&HM its "Violation of Section 1983 United States Code of Law" claim is derived from the "first ten amendments of the United States Constitution".  (DE 1-1, ¶ 75.)

3

See Eldecop, Inc. v. Charleston Cnty. Sch. Dist., 372 S.C. 470, 481–82, 642 S.E.2d 726, 732 (2007) (internal citation omitted).  The Court held there was no contract between Melendez and JB&HM that could have been breached; therefore, his claim failed the first element.

Next, as to the Danny Group Case's takings claim, the Court found that Danny Group, Blazian, and Melendez introduced evidence that they possessed a vested property interest in their respective business licenses and that Defendants harassed and intimidated them in an effort to eliminate their businesses for the purpose of purchasing the real property where they were operating.  However, the Court found that Danny Group, Blazian, and Melendez did not hold a vested property interest in the right to conduct their businesses.  The Court held that the assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment.  But business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense.  See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675, 119 S. Ct. 2219, 2225, 144 L. Ed. 2d 605 (1999).  Accordingly, the Court granted the Defendants' motion and dismissed the takings claim.

As to the Danny Group Case's due process claims, the Court held that to establish a violation of procedural due process, plaintiffs must show that (1) they had property or a property interest (2) of which the defendant deprived them (3) without due process of law.  See Sunrise Corp. of Myrtle Beach, 420 F.3d at 328.  As previously discussed, the Court found that Danny Group, Blazian, and Melendez do not have a property interest in operating a business.  The Court further held that there was sufficient due process between the suspension and revocation of the business license because there was an appeal process for the revocations.

Equally, the Court held that to show a violation of *substantive due process,* a plaintiff must show (1) that it had property or a property interest; (2) that the state deprived it of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency. See Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 440 (4th Cir. 2002). The Court concluded that the Danny Group Case Plaintiffs have a property interest in a business license, which the State arguably deprived them of by suspension and revocation of the business licenses. However, the Court found that suspension and revocation were not legally sufficient bases to find for the Danny Group Plaintiffs because those actions did not fall so far beyond the outer limits of legitimate governmental action that no process could cure considering such actions are constitutionally recognized police powers of the State.

In addition, Defendant City of Myrtle Beach also moved for a directed verdict on JB&HM's claims for tortious interference of contract and its Section 1983 causes of action. During oral arguments on the motion, JB&HM withdrew its State law civil conspiracy claim. After reviewing the evidence in the record and drawing all reasonable inferences in favor of JB&HM, the Court granted the Defendant's motion for a directed verdict on the tortious interference of contract claim and took the Section 1983 motion under advisement. As to the tortious interference of contract claim, the Court reiterated the elements for this cause of action, which are: 1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach; 4) the absence of justification; and 5) resulting damages. See Sunrise Corp. of Myrtle Beach, 420 F.3d at 322. The Court also stated again that where there is no breach of the contract, there can be no recovery. JB&HM introduced two contracts it had, one with Pure Ultra and the other with

Sawn Lowe and Joseph Lowe ( collectively "Lowe").[4]  The Court found that there was evidence in the record to support the existence of a contract and knowledge of the contract elements but that JB&HM had not offered any evidence to support the fact that Defendant's conduct procured its breach.  Rather, the evidence introduced at trial showed Pura Ultra terminated its lease because its business license was revoked, and Lowe terminated its lease because they did not obtain a permit or approvals for their intended use of the property.

After the Defendants presented their case, they renewed their motion for a directed verdict on Danny Group, Blazian, and Melendez's Section 1985 Civil Conspiracy Claim and JB&HM's 1983 claims.  As to the Section 1985 Civil Conspiracy claim, the Court held that to state a claim under 42 U.S.C. § 1985(3), a plaintiff must prove a conspiracy of two or more persons.  See Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995).  However, the Court noted that the intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with itself because the agents' acts are the corporation's own.  See Buschi v. Kirven, 775 F.2d 1240, 1251 (4th Cir. 1985).  Moreover, the Court noted that there are two important exceptions to the doctrine. First, the Court noted it is generally inapplicable where a co-conspirator possesses a personal stake independent of his relationship to the corporation.  See Painters Mill Grille, LLC v. Brown, 716 F.3d 342, 353 (4th Cir. 2013).  Second, the Court noted a plaintiff may state a conspiracy claim where the agent's acts were not authorized by the corporation.  See id.

Defendants argued that there was no conspiracy of two or more persons because all of the alleged individuals are employees or agents of the Defendant City of Myrtle Beach, including the City's manager, John Pederson.  Nevertheless, Plaintiffs contended that they sued Mr. Pederson in

---

[4]    Sawn and Joseph Lowe entered a commercial lease with JB&HM dated October 10, 2018, to lease 803 Main Street, Myrtle Beach, SC  29577, Unit A, to use as a "Bar/Lounge, Restaurant & Entertainment", with an option to purchase units A and B.  The lease contained a special stipulation stating, "[t]his Lease is subject to approval for the intended use by the city of Myrtle Beach."

6

his individual capacity because his communications and actions, which the record supports, involve a discriminatory racial animus, which was unauthorized and beyond the scope of his role as the City Manager.

However, the Court stated that the Fourth Circuit, in <u>Painters Mill Grille, LLC v. Brown</u>, held that Plaintiffs' argument would "render the intracorporate conspiracy doctrine meaningless" in the context of a § 1985(3) claim "because every claim under that statute depends on a showing that the conspirators shared an invidiously discriminatory motivation." 716 F.3d 342, 352 (4th Cir. 2013). Furthermore, the Court held that the intracorporate conspiracy doctrine "is not avoided simply by showing that corporate employees were motivated in part by personal bias;" rather, the Fourth Circuit in <u>Painter</u> held that the doctrine "probably would not apply where corporate employees are shown to have been motivated *solely* by personal bias…because the interests of the corporation would have played no part in the employees' collective action, so the action could not have been taken within the scope of employment. <u>Id.</u>

The Court concluded that the evidence in the record did not support a basis to find that John Pederson's motivations behind the City acquiring property in the Superblock were based *solely* on racial animus. Instead, the evidence in the record showed that the City of Myrtle Beach provided funding to acquire the property occupied by the Plaintiffs' businesses and that John Pederson as City Manager and as a member of the Myrtle Beach Downtown Redevelopment Corporation ("DRC") was motivated *in part* by increasing public safety in the Superblock and implementing the City's property acquisition plan. Plaintiffs do not dispute that the City of Myrtle Beach adopted a moratorium precluding new bars in the Superblock and that City Council voted to revoke Blazian Promotions and Pure Ultra's business licenses to operate the same in the Superblock. Therefore, the actions of the City's agents, including John Pederson, could not be

based *solely* on racial animus because Plaintiffs could not prove a conspiracy of two or more persons to deprive them of the right to operate their businesses pursuant to lawfully issued business licenses.  Accordingly, the Court, after reviewing the evidence in the record, drawing all reasonable inferences in favor of Plaintiffs, the Court granted Defendants' Motion for a Directed Verdict on Plaintiffs' claim for Violation of 42 U.S.C. § 1985(3) – Civil Conspiracy claim.

As to JB&HM's 1983 claims, the Court found that Plaintiff introduced evidence that it had contractual relationships with two third parties:  the first pursuant to a letter of intent from a purchaser to purchase its property contingent upon the acquisition of Pure Ultra's business and transfer of its liquor license; and second a lease between JB&HM and Lowe, which was subject to approval for its intended use among other things as a bar and lounge by the City. Equally, the Court found that there was evidence in the record to show that Defendant deprived JB&HM's tenants of their rights to operate businesses that sold liquor, which made it difficult for Plaintiff to sell its property.  Nevertheless, JB&HM's section 1983 claim in its complaint alleged that it has a special right contained in the first ten amendments of the U.S. Constitution and that any state action that hinders or terminates those rights requires compensation under the takings clause, the procedural due process clause, and the substantive due process clause.  (DE 1-1.)

As to JB&HM's procedural due process claim, the Court held that a jury would not have a legally sufficient evidentiary basis to find a procedural due process violation because there was no evidence in the record to show that the City failed to provide pre or post-deprivation notice or a right to be heard prior to precluding bars and nightclubs in the Superblock.  JB&HM's takings claim was based on JB&HM's argument that Defendant deprived it of its "right to operate a business[,]" and made it difficult to sell its property, thus its property right must be compensated

if any "state action . . . impinges, hinders, or terminates those rights . . ." under the first ten

amendments of the U.S. Constitution.  As stated in the Court's previous ruling, JB&HM does not

hold a vested property interest in "the right to conduct business."  See Coll. Sav. Bank, 527 U.S.

at 675, 119 S. Ct. at 2225 ("The assets of a business (including its good will) unquestionably are

property, and any state taking of those assets is unquestionably a "deprivation" . . . .  But business

in the sense of *the activity of doing business,* or *the activity of making a profit* is not property in

the ordinary sense . . . .").[5]  Therefore, the Court granted the City's directed verdict motion because

JB&HM failed to show any evidence of a taking of its property by the City.

As to JB&HM's substantive due process claim, the Court concluded that to establish a

violation of substantive due process, a plaintiff must show (1) that [it] had property or a property

interest; (2) that the state deprived [it] of this property or property interest; and (3) that the state's

action falls so far beyond the outer limits of legitimate governmental action that no process could

cure the deficiency.  See Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d at 440.  Although the Court

found that JB&HM introduced evidence to show it lost contracts because the City denied potential

tenants permits and licenses to operate bars and nightclubs in the Superblock, the Court found,

under these facts, that a reasonable jury would not have a legally sufficient evidentiary basis to

find for JB&HM.  Additionally, the Court found that the City's denial of permits or business

licenses to JB&HM's potential tenants was not a legally sufficient basis to find for JB&HM

---

[5]    The Court also held that "Takings" jurisprudence does not divide a single parcel into discrete
segments and attempt to determine whether rights in a particular segment have been entirely abrogated.  In
deciding whether a particular governmental action has effected a taking, this Court focuses rather both on
the character of the action and on the nature and extent of the interference with rights in the parcel as a
whole . . . ."  Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 130 (1978).  Accordingly, federal
courts have rejected the proposition that diminution in property value, standing alone, can establish a
"taking."  Id. at 131.  Equally, "takings" challenges have also been held to be without merit . . .  when the
challenged governmental actions prohibited a beneficial use to which individual parcels had previously
been devoted and thus caused substantial individualized harm."  Id. at 125.

because those actions did not fall so far beyond the outer limits of legitimate governmental action that no process could cure considering denial of permits is a permissible police power of local governments.  Furthermore, the Court found that there was nothing in the record indicating that JB&HM or its tenants were denied an opportunity to appeal the denial of the permits, or the suspension or revocation of the licenses.  Therefore, the Court granted the City's motion for a directed verdict.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  While Rule 59(e) does not supply a standard to guide the court's exercise of its power to alter or amend, the Fourth Circuit has recognized that a court may grant a Rule 59(e) motion "only in very narrow circumstances:  (1) to accommodate an intervening change in controlling law, (2) to account for new evidence not available at trial, or (3) to correct a clear error of law or prevent manifest injustice."  Hill v. Braxton, 277 F.3d 701, 708 (4th Cir. 2002).  Rule 59(e) motions may not be used to make arguments that could have been made before the judgment was entered.  See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998).  Moreover, "[a] party's mere disagreement with the court's ruling does not warrant a Rule 59(e) motion, and such a motion should not be used to rehash arguments previously presented or to submit evidence which should have been previously submitted."  Sams v. Heritage Transp., Inc., 2013 U.S. Dist. LEXIS 116496, 2013 WL 4441949, at *1 (D.S.C. August 15, 2013).  Rule 59(e) provides an "extraordinary remedy that should be used sparingly."  Pac. Ins. Co., 148 F.3d at 403 (internal citation omitted); see also Wright v. Conley, 2013 U.S. Dist. LEXIS 11086, 2013 WL 314749, at *1 (D.S.C. Jan. 28, 2013).

Whether to alter or amend a judgment under Rule 59(e) is within the sound discretion of the district court. See Bogart v. Chapell, 396 F.3d 548, 555 (4th Cir. 2005).

## DISCUSSION[6]

First, as to JB&HM's claims, Plaintiffs contend, "JB&HM's Section 1983 action also requires the court to address whether the City of Myrtle Beach singled out JB&HM (unequal treatment)[,]" relying "upon Village of Willowbrook v. Olech, 528 US 562 (2000) to support [the] Section 1983 claim" in which "the Supreme Court recognized a security against 'intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" (DE 142, p. 17.) JB&HM, however, does not address the Court's finding that the City's denial of permits or business licenses to Plaintiff's potential tenants were not actions that fall so far beyond the outer limits of legitimate governmental action that no process could cure because denial of permits is a permissible police power of local

---

[6]     As a preliminary matter, Plaintiffs allege that they "made a motion to amend the pleadings to conform with the evidence at trial." (DE 142, p. 14) (citing Rule 15(b) Fed. R. Civ. P. ("If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.")) Plaintiffs claim "[t]his specifically applied to Plaintiffs Monell claim under 42 U.S.C. Section 1983." (Id.) Although Plaintiffs did ask for "the pleadings to be conformed with the evidence," this request was not made because Defendants objected to evidence that was not raised in the pleading. Instead, this request was made during Plaintiffs' response in opposition to Defendants' directed verdict motion on Melendez's tortious interference with a contract claim, which the Court declined to do. Moreover, Plaintiffs never raised or pled a Monell claim as its Motion to Reconsider suggests. See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) ("Rule 59(e) motions may not be used to make arguments that could have been made before the judgment was entered."). Rather, Defendants' directed verdict motion was based on the fact that Melendez did not have a contract with JB&HM, but rather Pure Ultra, who was not a party to this action, was the entity that had a contract with JB&HM.

The fact that there was evidence in the record to support a contract with Pure Ultra rather than Melendez did not justify an amendment to the pleadings to add a new party to survive a directed verdict motion. Therefore, the Court declined to do so then. See Rule 16(b)(4) Fed. R. Civ. P., (since the deadline to add parties had expired (DE 4) "[a] schedule may be modified only for good cause and with the judge's consent.") Plaintiffs offered no explanation for making this request after the close of its case. Equally, Plaintiffs have not demonstrated where any of the narrow circumstances for reconsideration exist on this issue; therefore, the Court declines to reconsider an amendment to the pleadings here to include Plaintiff's Monell arguments.

governments. The Court further noted that nothing in the record indicates that Plaintiff or its tenants were denied an opportunity to appeal the denial of the permits or licenses. Therefore, there is no valid basis for the Court to reconsider its Order as to JB&HM.

As to Danny Group, Blazian, and Melendez's claims, Plaintiffs provide a painstaking review of the evidence in the record to purportedly support "the loss of ongoing and daily business revenue that was damaged by the improper and unlawful tactics of the police department; and (2) the unlawful discrimination/selective enforcement of the nuisance law against minority business owners." (DE 142, 18.) However, Plaintiffs again fail to address the Court's ruling on due process or the absence of a Selective Enforcement[7] cause of action by the Plaintiffs. As to procedural due process, the Court found Plaintiffs do not have a property interest in operating a business, and they did not offer any case law in support thereof. Further, there is sufficient due process between the suspension and revocation of the business license because there is an appeal process for the revocation. Accordingly, there is a process to cure any deficiencies. As to substantive due process, the Court found Plaintiffs have a property interest in a business license, which the State arguably deprived them of by suspension and revocation of the business licenses. However, such actions do not fall far beyond the outer limits of legitimate government action, as such actions are a constitutionally recognized police power of the state. Therefore, there is no valid basis for the Court to alter its determination or alter or amend its Order in this regard.

---

[7]    Danny Group, Blazian, and Melendez argue that they suffered disparate treatment from the selective enforcement of the City's nuisance laws or by revoking Blazian and Melendez's business licenses. (DE 142, p. 22.) Although Blazian and Melendez did not appeal their license revocations and Danny Group allowed its license to expire, these plaintiffs did not raise a Selective Enforcement claim or equal protection claim in their complaint. In fact, Plaintiffs conceded that the Danny Group Case and JB&HM Case lawsuits did not include a Fourteenth Amendment cause of action. Plaintiffs' new legal cause of action, which was available before trial, is not an appropriate basis for reconsideration under Rule 59(e).

Lastly, as to Plaintiffs' Intracorporate Conspiracy Doctrine grounds for reconsideration, Plaintiff claims <u>Painters Mill Grille, LLC v. Brown</u>, 716 F.3d 342, 352 (4th Cir. 2013) does not apply here because the "unauthorized acts by agents" exception applies and that <u>Painters Mill Grille, LLC</u> says, "if the only motive was personal bias, the exception would apply." (DE 142, p. 27.)  Plaintiffs' argument fails to demonstrate a clear error of law or manifest injustice.  First, Plaintiffs misconstrue the Court ruling that denied Defendants' directed verdict motion at the close of Plaintiffs' case by contending the Court ruled "the doctrine [was] not available." (DE 142, p. 24.)  To the contrary, the Court found that at that stage, the record showed that Pederson was named individually as a co-conspirator, and Plaintiffs introduced evidence that the City and Pederson targeted minorities for closure.  Accordingly, at the close of Plaintiffs case, "a reasonable jury would [] have a legally sufficient evidentiary basis to find for [Plaintiffs] on this issue . . . ." Rule 50(a)(1), Fed. R. Civ. P.  However, the Court then concluded, at the close of Defendants case, that the evidence in the record did not support a basis to find that Pederson's motivations behind the City acquiring property in the Superblock were based *solely* on racial animus.  See <u>Painters Mill Grille, LLC</u>, 716 F.3d at 352 (The intracorporate conspiracy doctrine "is not avoided simply by showing that corporate employees were motivated in part by personal bias;" rather, the doctrine "probably would not apply where corporate employees are shown to have been motivated *solely* by personal bias…because the interests of the corporation would have played no part in the employees' collective action, so the action could not have been taken within the scope of employment.")

Accordingly, the Court found that the evidence in the record showed that the City of Myrtle Beach provided funding to acquire the property occupied by the Plaintiffs' businesses and that Pederson as City Manager and as a member of the DRC was motivated *in part* by increasing public

safety in the Superblock and implementing the City's property acquisition plan. Plaintiffs do not dispute that the City of Myrtle Beach adopted a moratorium precluding new bars in the Superblock and that City Council voted to revoke Blazian Promotions and Pure Ultra's business licenses to operate the same in the Superblock. Thus, because the actions of the City's agents, including Pederson, could not be based *solely* on racial animus, there was no legally sufficient basis for a jury to find a conspiracy of two or more persons that deprived Plaintiffs of their right to operate their businesses pursuant to lawfully issued business licenses. Therefore, the Court's Order is not a clear error of law nor manifestly unjust, nor has there been a change in controlling law or new evidence to consider since the ruling.

Accordingly, there is no basis to reconsider the Court's prior Order. For these reasons, the Court denies Plaintiffs' motion for reconsideration.

**IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Florence, South Carolina
July 21, 2023

14

State of South Carolina   }

                         }       Before Myrtle Beach City Council

City of Myrtle Beach     }

City of Myrtle Beach Business License Official}

                               }

v.                                  }

                               }       **ORDER OF CITY**
                               }       **COUNCIL OF MYRTLE**
                               }       **BEACH**

Blazian Promotions & Company, LLC d/b/a  }

Natalia's Bar &Grill,                   }

Business License # 29217           }

_____}

## Statement of Appeal

Blazian Promotions & Company, LLC d/b/a Natalia's Bar and Grill

(Natalia's), a late night drinking place, has appealed the suspension of its business

license that was suspended on the grounds that Natalia's had engaged in an

unlawful activity or nuisance related to the business and that Natalia's breached the

conditions of its business license. A hearing was duly held before City Council on

Natalia's appeal. Present at the hearing were Natalie Litsey, business owner of

Natalia's, and her attorney Jim Irvin. Also present were Business License Official

Mary McDowell and her attorney Michael W. Battle. The business license official

testified, introduced exhibits and called witnesses who were cross examined by

Natalia's attorney. Natalie Litsey was the sole witness who testified on behalf of

Natalia's.

1

Add.28

RECEIVED
JAN 1 7 2017
12:45 PM
CITY CLERK'S OFFICE
Hand Delivered
Josh Grove

Factual Findings

*a. Service calls.*

1. From March 25, 2015, to November 10, 2016, Natalia's had a call history of 94 calls for assistance from the police. Natalia's has an occupancy capacity of 133 people. By comparison, for the same period, St. George, a similar business nearby, had a call history of 26 calls for assistance. St. George has an occupancy rating of 229. Natalia's call history indicates problems with unlawful activities and with following its Safety Plan.

2. The calls may be broken down as follows:
   - 4 Assaults
   - 1 Burglary Auto
   - 5 City Code or Business License Violation
   - 11 Directed Patrols
   - 5 Disturbance/Disorderly
   - 1 Found Property
   - 3 Larceny
   - 4 Loitering
   - 5 Narcotics Related
   - 32 Public Assistance
   - 2 Shooting Incidents
   - 4 Suspicious Persons
   - 2 Wanted Persons

*b. Nuisance Activity Illegal Drugs*

3. On December 5, 2015, John Reamsnyder, while employed at nearby bar, Farlo's Burrito Bar, was arrested and charged for carrying illegal drugs ranging from cocaine to meth to ecstasy to marijuana. Two scales were

2

found in the car, and the drugs were packaged in multiple zip-lock baggies for distribution. Reamsnyder was carrying a handgun in his waistband and another handgun was found in a book bag in his car.

4. On December 25, 2015, MBPD encountered Reamsnyder in Natalia's reeking of a strong odor of marijuana. He stated he was employed by Natalia's. The officer's report noted that Reamsnyder was a known drug dealer. When contacted about Reamsnyder, Natalia's business owner stated to Officer Robertson that she was aware of Reamsnyder's past but that he had told her he had sworn off drugs and was no longer dealing. Ms. Litsey testified that she watched Reamsnyder closely while he was in her business but did not follow his activities in the parking areas around her business.

5. On January 24, 2016, Reamsnyder was observed by police officers outside the back door of Natalia's selling drugs to Natalia's customers. He was arrested and found to have 25 schedule IV pills and 6 unknown green pills believed to be ecstasy.

6. On January 25, 2016 Ofc. Robertson contacted the business owner again and notified her of the additional drug incidents involving Reamsnyder. The business owner stated Reamsnyder would be fired and not allowed back at Natalia's.

7. On January 28, 2016, Reamsnyder was arrested again in the parking lot directly behind Natalia's for simple possession of marijuana. At the time of his arrest he stated was employed at Natalia's as a promoter.

8. On March 1, 2016, Reamsnyder was again observed in the parking lot behind Natalia's selling drugs to Natalia's customers.

9. On July 2, 2016, Daniel Whittington, a disc jockey employed by Natalia's, was observed retrieving a mason jar containing marijuana and small baggies and a handgun from his car that was parked at the back door of Natalia's. When MBPD officers approached Mr. Whittington he ran into Natalia's and attempted to hide the mason jar and handgun behind the D.J. booth inside Natalia's. The police arrested Mr. Whittington. During the arrest, the customers of Natalia's were disorderly, interfering with the police investigation by confronting the officer's with questions and refusing to move away from the arrest scene. Security officers did not cooperate with the police at the arrest scene. Two additional arrests of Natalia's customers were made for public intoxication.

10. On August 10, 2016, David Cuccia, a security guard formerly employed by Natalia's, gave a sworn statement that at Natalia's there were many activities that were illegal such as occupancy violations, illegal gambling, drug usage, gang activity, violation of liquor laws ( serving after 2:00 am) sale of closed

4

bottled liquor, weapons (handgun) and illegal sale of alcohol in the bathroom.

11. Unlawful activities and nuisance activities in connection with Natalia's business operations were committed repeatedly by Natalia's employees during 2015 and 2016.

c.    *Nuisance Activities – Violence*

12. On July 21, 2016, a shooting occurred inside Natalia's where the victim was shot three times by a known gang member with a handgun. After the shooting, security cleared out Natalia's customers. When everyone left the building, the manager locked the doors and left the premises. The police were never called by Natalia's employees. MBPD learned of the incident through a report that a gunshot victim had come to Grand Strand General Hospital.

13. Natalia's manager, Donato Eagan, was charged with nuisance activity by failing to report the incident as required by City Ordinances. *Sec. 10-24 Code of Ordinances.* Later, she was tried and found guilty of the charge.

14. MBPD did obtain a video recording of the shooting from Natalia's security cameras. Upon observing the video, MBPD discovered numerous violations of Natalia's Safety Plan which will be discussed below. The Safety Plan violations included among other things the failure to report the incident to

5

the police. As a result Natalia's Safety Plan was temporarily revoked by MBPD.

15. Natalia's employees violated the conditions of its Safety Plan by failing to contact MBPD and reporting the shooting incident of July 21, 2016.

16. On October 22, 2016, officers responded to shots fired behind Natalia's. Sgt. Steven Clothier spoke with Natalia's security guard. The security guard told Sgt. Clothier that prior to the shooting, four black men who appeared to be armed had approached Natalia's to come inside. One of the men told the security guard that they were looking for the person who had just broken into his car. Natalia's security locked their doors and refused to let the men into the club. Security then watched the men leave and cross a nearby parking lot. After hearing the shots, they watched the men leave and watched one of the men return, get into the car of a high ranking Blood gang member and then leave the scene.

17. Again Natalia's licensees violated its Safety Plan by not reporting the incident to MBPD. The security guard told Sgt. Clothier that he called his dispatch but did not call the police. He said that he did not have the opportunity to call police because police responded so quickly. The security guard also told Sgt. Clothier that he had not seen any of the men before and did not know their names. However, the security guard went on to tell Sgt.

Clothier that one of the men frequents Danny's, a club off of Hwy. 501

outside the City, and the bouncer at Danny's, Rico, would know the suspect.

He also told Sgt. Clothier that one of the men left in a burgundy Caprice,

which is owned by a high ranking Blood gang member. The security guard's

contradictory statements – that he had never seen the men before and then

giving information about their habits and associates – led Sgt. Clothier to

believe the security guard was not completely forthcoming about the

identities of the four black men.

d.      *Safety Plan Violations.*

18. On April 22, 2014, and on September 23, 2014, the City of Myrtle Beach

adopted ordinances that required drinking places and nightclubs to create

and adopt Safety Plans to foster public safety for our citizens and visitors, to

curb underage drinking, to increase awareness of over-service of alcoholic

beverages and to meaningfully address and reduce criminal activity on the

business premises of drinking places and nightclubs. The plan submitted by

the businesses was required to be approved by the MBPD. Once submitted

and approved, the Safety Plan became part of the conditions of Natalia's

business license.

7

19. Natalia's is a drinking place that comes under the ordinance. On April 13, 2015, Natalia's Safety Plan was submitted and approved by the MBPD. The Safety Plan contained the following agreements among others:

a. Natalia's will have a contractual agreement in place with Advanced Protective Services to maintain security inside and outside of the premises. Female security officers will be available to assist with the female patrons. Drugs of any sort will not be permitted or tolerated in or outside of the premises.

b. Aggressive and/or violent behavior would not be tolerated. Patrons who are disorderly will be detained by the SLED certified guards until the Myrtle Beach Police Department arrives.

c. No alcohol consumption will be permitted in the parking areas and outside the premises of the building.

d. Staff will not be allowed to consume alcohol beverages while working.

e. All staff will monitor patron's alcohol consumption and will set reasonable limits for all patrons to ensure they are safe and as well as, the safety of others.

f. Incident reports will be completed for any incident that involves a patron/employee that has become uncontrollable.

g. Natalia's will co-operate with MBPD to delay detain patrons via warrantless arrest. 911 Emergency services will be contacted if incidents become out of order.

h. Response to Serious Criminal Incidents. In the event of serious criminal incident, suspects and witnesses will be detained until emergency services and local law enforcement arrives. Surveillance video, witness statements, in-house incident report and any other necessary documentation will be released to the appropriate parties. Natalia's will package the following for Law Enforcement Agencies:

    a. Financial records of patron(s) purchases

    b. Video images of all involved parties

    c. Images of scanned ID's

    d. Glasses and utensils used by the involved parties, which may yield further evidence.

    e. Observation statements of witness.

9

20. The video recording of the shooting that occurred on July 21, 2016, revealed that with the exception of making a video recording none of the above listed conditions in the Safety Plan were followed by Natalia's on the night of the shooting. As a result, Natalia's Safety Plan was revoked on July 29, 2016.

21. On August 1, 2016, Officer Lisa Robertson served Natalia's with notice that the MBPD had revoked Natalia's safety plan and any further operation of Natalia's would be a public nuisance.

22. On August 5, 2016, Natalia's was open for business, and the manager misrepresented to police officers that Natalia's had an approved safety plan. On August 6, 2016, Natalia's was again open without an approved safety plan. When officers approached the club, there was no security working the front door. The business owner was not at the club. MBPD officers wrote the bartender a citation for operating without a safety plan. The bartender asked if Natalia's had to close, and the officers told the bartender they could not force the club to close, but remaining open would reflect poorly on the club. The club chose to stay open for the rest of the night.

23. After considerable discussions with Natalia's about its violations, Natalia's received permission to submit a revised security plan. On August 22, 2016, Natalia's revised security plan was approved by MBPD.

24. On October 22, 2016, the second known shooting incident occurred behind Natalia's. As stated above, prior to the shooting, four men who appeared to be armed had approached Natalia's to come inside. One of the men told the security guard that they were looking for the person who had just broken into his car. Natalia's security locked their doors and refused to let the men into the club.

25. Natalia's security felt so certain that the four men intended to commit violence that they locked the doors to the club and would not let them inside. Security then watched the men walk across the nearby parking lot, heard gunshots in the rear alley, then security watched the men run from the scene and watched one come back into the parking lot and get in the car of a high ranking Blood gang member. While the security had time to call their own dispatch, no one ever called the police. Failing to call police in the face of such criminal activity is the same issue MBPD had with Natalia's violation of its Safety Plan after the July 21st shooting.

26. Natalia's did not have a video recording of the October 22nd incident to provide to the investigating officers. Natalia's failed to replace the video recorder taken into evidence by MBPD. The failure to have an operational video recorder violated Natalia's Safety Plan.

11

27. By violating its Safety Plan, Natalia's violated the conditions which governed its right to do business under its business license in the City of Myrtle Beach.

e. *Business License Suspension.*

28. On November 14, 2016, Myrtle Beach Police Chief Warren Gall sent a letter to Business License Official, Mary McDowell, requesting that Natalia's business license be revoked.

29. The business license official conducted an independent investigation of Natalia's and determined that Natalia's business license should be suspended.

30. On November 28, 2016, Natalia's was given notice of the business license suspension and her right to appeal the suspension to City Council. Natalia's duly appealed the suspension and a hearing was scheduled before City Council for January 10, 2017.

*Conclusions of Law*

1. The license official may suspend or revoke a business license upon determining that: a licensee has breached any condition upon which the license was issued or has failed to comply with the provisions of this ordinance; or a licensee has engaged in an unlawful activity or nuisance related to the business. *Sec 11-35 Code of Ordinances City of Myrtle Beach*

12

2.    Licensee means the business, the person applying for the license on behalf of the business, an agent or legal representative of the business, a person who receives any part of the net profit of the business, or a person who owns or exercises control of the business. *Sec 11-35 Code of Ordinances City of Myrtle Beach.*

3.    Every drinking place, nightclub operator, and nightclub entertainment promoter is required to have a business license and an approved safety plan in order to operate and provide entertainment activities. An operator or promoter shall have an approved safety plan as a condition of obtaining a new business license or renewing an existing license. *Sec 14-4 Code of Ordinances City of Myrtle Beach.*

4.    Public nuisance means those conditions or events which constitute an unreasonable interference with rights of the public in general, and where, in a public place, or where the public congregates, or where the public is likely to come within the range of influence through the senses, a person unlawfully does an act or omits to perform a duty, which act or omission does any one or more of the following: annoys, injures, subverts or endangers the public's order, economy, resources, safety, health, welfare, comfort, repose or offends public decency. *Sec 10-21 Code of Ordinances City of Myrtle Beach.*

13

5. Public nuisances are activities that affect public decency, peace and order, whether such violations are of an intermittent, cyclical, continual, reoccurring or constant nature; and when the responsible party generates, enables, or contributes to the occurrence of the unlawful behavior by an absence or failure of property management policy or practice, absence or failure of control over the property, absence or failure of supervision of guests or invitees, absence or failure of security measures. *Sec. 10-22, Code of Ordinances City of Myrtle Beach.*

6. Any person who directly observes a nuisance posing an emergency threat to the public health or safety or to the environment shall immediately report the incident to the Myrtle Beach Police/Fire Communications Center and shall provide any information requested by the law enforcement officer needed to investigate or abate the potential emergency. *Sec. 10-24, Code of Ordinances City of Myrtle Beach.*

7. A person who erects, establishes, continues, maintains uses, owns, occupies, leases, or releases any building or other place used for the purposes of repeated acts of unlawful possession or sale of controlled substances, or continuous breach of the peace in this State is guilty of a nuisance. *SC Code Ann. §15-43-10.*

14

8. Natalia's has breached the conditions of its Safety Plan and Natalia's has breached the conditions upon which its business license was issued.

9. Natalia's breach of its Safety Plan and its breach of the conditions upon which its business license was issued merit revocation of its business license. *Sec. 11-35 Code of Ordinances City of Myrtle Beach.*

10. Natalia's has failed to comply with the provisions of the above mentioned City ordinances. *Sec. 11-35 Code of Ordinances City of Myrtle Beach.*

12. Natalia's violation of the City's ordinances merit revocation of its business license. *Sec. 11-35 Code of Ordinances City of Myrtle Beach.*

13. Natalia's has engaged in an unlawful activity or nuisance related to the business. *S.C. Code Ann. §15-43-10; Sec. 11-35 Code of Ordinances City of Myrtle Beach.*

14. Natalia's unlawful activity or nuisance related to the business merit revocation of its business license. *S.C. Code Ann. §15-43-10; Sec. 11-35 Code of Ordinances City of Myrtle Beach.*

15. Based upon City Council's review of all the exhibits and testimony the decision of the business license official's to suspend the business license of Natalia's was not arbitrary or capricious.

16. The notices, appeal proceedings and opportunity to confront and cross examine witnesses that were provided to Natalia's by the City complied with applicable due process requirements.

## ORDER

After considering all of the facts presented by the business license official and by Blazian Promotions & Company, LLC d/b/a Natalia's Bar & Grill, City Council for the City of Myrtle Beach hereby affirms the business license official's suspension of business license #29217 issued Blazian Promotions & Company, LLC d/b/a Natalia's Bar & Grill. Further, City Council for the City of Myrtle Beach hereby revokes business license #29217 issued to Blazian Promotions & Company, LLC d/b/a Natalia's Bar & Grill.

Approved:

**City of Myrtle Beach**

John Rhodes, Mayor
On behalf of City Council

January _26_ , 2017